In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2783

FLOYD K. HAYES,

*Plaintiff-Appellant,*

*v.*

DONALD N. SNYDER, JESSE MONTGOMERY, MARK A. PIERSON, WANDA L. BASS, and WILLIAM M. HAMBY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04-cv-1062—**Michael M. Mihm**, *Judge.*

ARGUED MAY 30, 2008—DECIDED OCTOBER 9, 2008

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Since 2001, Floyd K. Hayes has suffered from a medical condition that causes spasms in the cremasteric muscle associated with the left side of his scrotum. During these spasms, which occur at least once, and often multiple times, each day, Hayes's cremasteric muscle cramps and retracts, compressing his testicle and causing excruciating pain. When these

spasms began, around September 2001, Hayes was an inmate at Illinois's Hill Correctional Center ("Hill"). From that time through August 2002, when Hayes was released from Hill and placed on parole, he repeatedly sought medical treatment for this pain. In 2004, he brought this lawsuit under 42 U.S.C. § 1983, alleging that Dr. William M. Hamby, medical director at Hill during the relevant time period, and various non-medical prison officials were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court granted summary judgment in favor of both Dr. Hamby and the non-medical defendants. Hayes challenges both rulings on appeal. We affirm the judgment in favor of the non-medical prison officials, but we reverse the judgment for Dr. Hamby and remand the case for trial.

**I**

Hayes, now in his early 60s, is a Vietnam War veteran and former Kentucky State Trooper. In 1997, he began serving a 10-year sentence in the Illinois Department of Corrections, the bulk of which he spent at Hill. Hayes first complained of testicular cysts in the fall of 2000. An ultrasound ordered by Hill physician Dr. Mohammed Choudry revealed that the cysts were benign; blood work and urinalysis results were normal. Dr. Choudry did not refer Hayes to a urologist, but he did discuss Hayes's case with a urologist in December 2000. Choudry concluded that neither the removal of the cysts nor a referral for a urology consult or biopsy was indicated.

As time went on, the cysts became larger and more painful. Worried and experiencing intense discomfort, Hayes asked in March 2001 to be seen by a urologist for a biopsy of the cysts. His request and related grievance were denied, and Hayes took no further action until September 2001, when his pain began to bother him on a daily basis. He sought treatment and was given a prophylactic antibiotic and Tylenol III for the pain. As instructed, Hayes visited the medical unit on October 4, 2001. He saw Dr. Hamby that day, and also 10 days later. (Those were his only two "in-person" visits with Dr. Hamby.) Dr. Hamby wrote on Hayes's chart that he observed "tenderness" and "discomfort," but he did not use the word "pain." Hayes asserts that he complained of pain at those visits; Dr. Hamby counters, based solely on his notes, that he must not have thought Hayes was in much pain. (Dr. Hamby asserted that he had no independent memory of Hayes.)

When Hayes returned to the medical unit on October 29, 2001, he saw Dr. Richard Shute for the first of several times. Dr. Shute's notes from those visits indicate that he wanted to refer Hayes to a urologist and prescribe prescription-strength pain medications, but that Dr. Hamby refused to approve those treatments. Hayes's recollection of his visits with Dr. Shute suggests the same: "[Dr. Shute] said he couldn't make Doctor Hamby give me those outside tests that he had asked for. . . . He told me he couldn't give me nothing different because Hamby wouldn't approve. Everything Shute did, okay, Doctor Hamby had to approve or disapprove."

Dr. Hamby stated in his deposition that he never approved the urology referral or painkiller prescriptions because he did not receive the proper forms. Nothing in the record establishes whether such forms were in fact filled out or, indeed, whether they were required at all. What we do know is that Dr. Shute made notes in Hayes's chart about Hayes's increasing pain, wrote at least once that Hayes should have a urology referral, and also prescribed ibuprofen and wrote permission slips that allowed Hayes to have ice packs to ease his pain.

These minimal remedies did not provide relief for Hayes. Having been told by Dr. Shute that no more could be done "because Hamby wouldn't approve," Hayes began to write letters and to file grievances with non-medical prison officials, complaining that he was not receiving adequate treatment from the medical unit—specifically, Dr. Hamby. He wrote a letter on April 16, 2002, addressed to Assistant Administrative Director Jesse Montgomery. The letter expressly asked to see a "specialist" in the appropriate field of medicine "to determine what these growths are." He referred to a prior letter that he had sent to Hill Director Donald Snyder, and then attempted to describe his condition, asking Montgomery to "excuse my graphic details":

> My testicles swell abnormally. My left testicle draws upward like a leg cramp which causes my penis to bend upward into a fishhook position. In order to urinate, I must reach down and under to pull my testicle down to unbend my penis. As you can imagine, this is an extremely painful thing that I must do each time I go to the bathroom.

He reiterated that this was an "ongoing undiagnosed condition"; noted that at least one examining physician had said that Hayes should be seen by a urology specialist, but Dr. Hamby had denied the request; and wrote that "[i]n the meantime, I remain in constant pain with new growths being discovered weekly."

After Montgomery received this letter, an administrative assistant at Hill wrote the following email, sent May 9, 2002, to personnel in the medical unit:

> I am researching a response to inmate Hayes for ADD Montgomery. In Inmate Hayes' correspondence he complains of insufficient care by health care staff, i.e., testicles continue to swell, difficulty urinating due to bent penis, numbness in right palm and fingers . . . . Bottom line, he wants out early. Can you give me any update on his medical condition? When conducting prior review in December 2001, his condition was then reported as remaining stable and health care needs being addressed. Just a brief history/comments will suffice.

Dr. Hamby responded to this email sometime in May 2002 with a three-page, single-spaced summary of Hayes's chart and medical history, starting in September 2000. Dr. Hamby's letter concluded by stating that Hayes had "a right epididymal cyst" and a "small left epididymal cyst. These have remained stable except for self-reported swelling and occasional tenderness. . . . Telephone consultation and length of follow-up indicate the epididymal cysts are simply cysts. Biopsy and/or surgical excision are not indicated at this time."

Assistant Warden Wanda Bass was placed in charge of responding to Hayes's complaint, and she sent a letter to Hayes on May 24, 2002, stating that she had contacted the medical unit director (Dr. Hamby), who in turn indicated that Hayes was being "seen and monitored on a regular basis."

Hayes wrote a response to Bass on June 10, 2002, reiterating that the problem was that he was being "seen and monitored," but not being *treated*. In addition to repeating his complaints about his "severe pain" and the medical unit's refusal to order a referral or tests, he added that "[a]lthough I was given pain medication in the past, they now refuse to do so." He attached his medical files to the letter, noting that they "clearly show the pain and extreme changes" in his condition that he had to endure. Bass responded to this letter on June 17, 2002:

> As indicated in my response to you dated 05/24/02, your medical concerns have been reviewed by appropriate medical staff. However, upon receipt of your most recent correspondence, I had a discussion with the Health Care Unit Administrator. Your medical chart has again been reviewed.

> According to your medical records, you have a history of scrotal cysts which occasionally swell and cause you pain. These cysts do respond to ice packs and Ibuprofen. The Urologist you saw on December 16, 2000 and the current medical Director indicate that you do not require further intervention. However, if you feel you need further education regarding cysts, please sign up for nurse sick call.

Warden Mark Pierson concurred with Bass's conclusions in a letter dated July 1, 2002.

The conclusion of the non-medical prison officials, based on the information they had received from Hill's medical staff, was that nothing further needed to be done about Hayes's medical complaints. For the sake of accuracy, however, we note that Bass was in error when she referred in her letter of June 17 to Hayes's seeing a urologist on December 16, 2000. Hayes never "saw" a urologist while he was at Hill; Dr. Choudry, a non-specialist, simply noted in Hayes's chart that *he* had discussed Hayes's case with a urologist. Furthermore, although Bass was correct that Hayes's pain often responded to ice packs and ibuprofen, even those minimal treatments were taken away from him at some point.

Although Hayes did not find Bass's response satisfactory, he did as she suggested and filed four "nurse sick call" requests between May and July of 2002. These efforts were unavailing. In addition to writing letters, Hayes also filed a formal grievance on June 20, 2002, stating that he had repeatedly complained about his "extreme pain, cancer, and swollen testicals [*sic*], and lack of medical care to all concerned parties." He further noted that "I'm in extreme Pain" and requested "Pain Medication, Proper cancer test, po[ss]ible removal of growths on testicals [*sic*] [,] Ice for Swollen Testicals [*sic*], Proper outside medical Care."

The grievance officer denied this grievance on July 12, 2002, stating that "Dr. Hamby (MD) responds [that] inmate Hayes' [*sic*] first complained of testicle problems on

9/18/00. Was treated and tested accordingly." This indicates that despite Dr. Hamby's assertion that he was not involved with Hayes's case at any time after October 2001 and that he "would never have seen" Hayes's June 20, 2002, grievance, a trier of fact could conclude otherwise. The grievance report makes several references to Dr. Hamby, and it states that Dr. Hamby was the source from which the grievance officer received the information upon which he based the denial. The response Dr. Hamby supplied to assist with Bass's reply to Hayes's April 16, 2002, letter also was apparently used as the basis for denying the formal grievance that Hayes filed on June 20. Warden Pierson concurred in the denial of that grievance on July 18, 2002.

Hayes was released from Hill on August 15, 2002. The same day, he went directly from the prison to the Veterans' Administration ("VA") Hospital in Danville, Illinois, seeking treatment for his pain. When he arrived, the hospital staff thought that his chief issues involved his mental, not physical, health. The reason is simple: three days before Hayes's release from Hill, the hospital received a call from Hill informing it that Hayes likely would be going there upon his release and that his "primary problems are psychiatric." Hayes does suffer from post-traumatic stress disorder on account of both childhood trauma and his service in Vietnam, but his reasons for visiting the hospital that day had nothing to do with post-traumatic stress disorder. The progress notes from the date he was admitted report that Hayes was "admitted on 8/15/02 with the chief complaint of testicular pain." Notwithstanding that complaint, the hospital sent Hayes

straight to the psychiatry ward and gave him only 15 minutes with a urologist, Dr. Narayan R. Amin. The Danville hospital did, however, provide Hayes with prescriptions for ibuprofen and Darvocet (a narcotic) for his pain before discharging him on August 25, 2002.

Hayes then left Danville and went on to his final destination, Kentucky, where his family is. There, Hayes saw a nurse practitioner at the Lexington VA Hospital on September 12, 2002. She evaluated him and ordered a testicular ultrasound and urology consult. On September 30, 2002, he saw primary care physician Dr. Alicia Bigham, who prescribed Lortab (another narcotic) for his pain; he then saw urologist Dr. William Terence Connor on October 10, 2002. Dr. Connor diagnosed Hayes with "crema[s]tic muscle spasm with chronic pain and peronies [*sic*] disease." Peyronie's disease is a connective tissue disorder involving the growth of fibrous scar tissue in the soft tissue of the penis. The hardened scar tissue prevents the normal tissue from moving where it otherwise would in a healthy organ, and this causes an abnormal (and often painful) curvature of the penis. Urologists can diagnose this condition, though it sometimes takes an even higher degree of specialty because "the disease and its current treatments are not well understood by most urologists in general practice." See http://en.wikipedia.org/wiki/Peyronie's_disease. After getting this diagnosis, Hayes was referred to a pain-management specialist, Dr. Joseph Atallah, for treatment. He remains under Dr. Atallah's care and continues to receive treatments and medication to manage his chronic pain.

Hayes filed this lawsuit under 42 U.S.C. § 1983 on March 3, 2004, alleging that Dr. Hamby knew that Hayes was enduring excruciating pain and nonetheless refused to provide readily available prescription-strength pain medication or to refer Hayes to a urology specialist who could diagnose and properly treat him. He further asserted that Dr. Hamby and his subordinates provided only non-prescription medication and ice packs, and that Dr. Hamby terminated even this minimal treatment for Hayes's pain after finding out that Hayes had complained to non-medical prison officials about his pain and filed formal grievances about his medical care. In addition, Hayes contended that the non-medical prison officials also violated his constitutional rights when they failed properly to respond to his serious medical condition.

On March 19, 2007, the district court granted the defendants' motions for summary judgment, ruling both on the merits and on the basis of qualified immunity. It denied Hayes's motion to alter the judgment, and this appeal followed. We note that although Hayes's complaint initially named four non-medical defendants, he has voluntarily withdrawn two of them (Director Snyder and Assistant Administrative Director Montgomery), leaving only Warden Pierson and Assistant Warden Bass for this appeal.

## II

We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to the non-moving party. *Koger v. Bryan*, 523

F.3d 789, 796 (7th Cir. 2008). "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In *Greeno*, we spelled out the two-part test that applies to these claims:

> A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted); *see also Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *See Foelker v. Outagamie County*, 394 F.3d 510, 512-13 (7th Cir. 2005). To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Farmer*, 511 U.S. at 837. This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. *Walker*,

293 F.3d at 1037. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. *Id.* Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

*Id.* at 653 (parallel citations omitted).


A

We consider first whether, as an objective matter, Hayes has presented enough evidence to support a finding that he suffered from a serious medical condition. In *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997), we explained that a prisoner's medical need is "serious" where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," and we noted, with approval, that other courts had found the following circumstances to be indications that a prisoner has a serious medical need: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (citations and quotation marks omitted).

The non-medical defendants did not brief the issue of serious medical need; they rely for that point on the reasoning of the district court and whatever Dr. Hamby had to say in his brief. They focus instead on their argu-

ment that they lacked the subjective component of deliberate indifference, and so we postpone our consideration of Hayes's claim against them until we reach that issue. Dr. Hamby urges us to find that Hayes did not have a serious medical need. He also characterizes Hayes's position as a request for a rule under which "a prison physician violates the Eighth Amendment when he or she fails to diagnose at the very first stage a rare, progressively worsening condition that masquerades in its early stages as an insignificant medical condition." The Eighth Amendment, he concludes, requires no such thing.

But Dr. Hamby is asking us to disregard important parts of the record. As we have detailed above, Dr. Hamby's involvement in Hayes's case was much greater than he is implying here. Although Dr. Hamby gave Hayes's complaints of pain little weight, we have recognized that "self-reporting is often the only indicator a doctor has of a patient's condition," and so there "is no requirement that a prisoner provide 'objective' evidence of his pain and suffering." *Greeno*, 414 F.3d at 655. Hayes did try to obtain a referral to a specialist, who presumably could have provided (one way or the other) the kind of "objective" evidence that Dr. Hamby thinks was lacking. Hayes was never permitted to see a specialist, however, because Dr. Hamby refused to authorize a referral. See *id.* ("[T]he defendants fail to acknowledge that Greeno spent two years *trying* to obtain 'objective' evidence, but was prevented from doing so by Dr. Daley and the other medical providers."); see also *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996).

The district court concluded that because a layperson would not be able to "diagnose" Hayes's malady or "determine what treatment was needed," Hayes's condition was not objectively serious. This is not the correct standard. The Eighth Amendment's protections are not triggered only by conditions that a layperson would be able to diagnose and treat, especially when the defendant is not a layperson but is instead a physician. A trier of fact could conclude in Hayes's case that even a layperson would realize that a man with cysts and growths on his testicles, who could not even urinate without extra-ordinary measures and who repeatedly complained of excruciating and increasing pain, would require "a doctor's attention." Even more so, a reasonable physician should have realized that the patient was trying to bring a serious condition to his or her attention. See *Gutierrez*, 111 F.3d at 1373 (recognizing that a "serious medical need" exists where the condition features "chronic and sub-stantial pain"). Hayes has met his burden of showing, for purposes of summary judgment, that he was suffering from a serious medical condition.


B

The subjective component of Hayes's Eighth Amendment claims requires him to present facts from which a jury could find that the relevant officials knew of Hayes's serious medical condition but intentionally or recklessly disregarded it. *Greeno*, 414 F.3d at 653 (citing *Farmer*, 511 U.S. at 837); *Walker v. Benjamin*, 293 F.3d 1030, 1039-40 (7th Cir. 2002) (collecting cases). Hayes does not need to

prove that his complaints of severe pain were "literally ignored," see *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000); rather, he must show only that the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs. *Greeno*, 414 F.3d at 653 (citing *Farmer*, 511 U.S. at 837). We begin our analysis of this component with Dr. Hamby, and then consider the non-medical defendants.

1

Dr. Hamby argues that he cannot be deemed deliberately indifferent because the diagnosis that Hayes eventually obtained was for a "rare, progressively worsening condition which objectively appears in its early stages as an insignificant medical condition." He argues that Hayes's condition when he arrived at the Lexington VA Hospital in late September 2002 was not the same as what Dr. Hamby saw when he examined Hayes in October 2001. He identifies the critical question presented here as: "was Dr. Hamby's medical treatment of this prisoner was [*sic*] so blatantly inappropriate as to evidence intentional mistreatment?" This is almost correct, but it is missing a crucial point. This case comes to us on summary judgment. Thus, the complete question is whether, when viewing the record in the light most favorable to Hayes, a reasonable trier of fact *could* conclude that Dr. Hamby was subjectively aware of Hayes's serious medical condition and either knowingly or recklessly disregarded it.

Subjective awareness and deliberate indifference normally can be proved only with circumstantial evidence. Here, the record includes a number of facts that would support those findings with respect to Dr. Hamby. First, as we already have pointed out, Dr. Hamby's involvement in Hayes's treatment at Hill was not limited to his two in-person examinations of Hayes in October 2001. He was monitoring Hayes's treatment at least enough to be in a position to provide the non-medical prison officials with a thorough summary of Hayes's chart in May 2002. In addition, Dr. Hamby's approval was required before various treatments, such as prescription-strength medicine or a referral to a specialist, could be administered to Hayes, and he refused to give that approval. Dr. Hamby acknowledged in his deposition that other physicians at Hill had requested these treatments for Hayes. He asserted that the reason he denied their requests was that he did not receive the proper paperwork. That may or may not be true—it depends on whether a trier of fact would believe Dr. Hamby's explanation. What is important at this point is that this testimony reveals that Dr. Hamby continued to be aware of Hayes's condition and involved in his treatment long after October 2001.

Dr. Hamby's deposition testimony also suggests that even if he had received formal paperwork requesting the additional treatments, he probably would have done nothing differently. Dr. Hamby stated flatly in his deposition that *no* pain experienced by *any* prisoner ever warrants prescription-strength painkillers. He acknowledged that the "policy for all physicians in [the Department of Corrections]" is to dispense prescription-strength pain

medications (opiates) only when the physician "absolutely felt they were necessary." He went on, however, to state his belief that prisoners never needed such drugs, and so he personally never prescribed them. When asked what he would do if he saw a patient "whose level of pain or whose condition warranted an opiate level of pain medication," Dr. Hamby replied that he would "[p]ut them in the infirmary and observe them and you very rapidly found that Tylenol was all they needed. That was my experience." This suggests that even if the allegedly required forms had been submitted to Dr. Hamby, he would not have signed off on a request to provide Hayes with prescription-strength pain medicine. (Dr. Hamby never distinguished between opiates and other types of prescription pain medications, and so a trier of fact would not be compelled to conclude that his concerns extended to opiates alone.)

Dr. Hamby's attorney objected to any line of questioning relating to his client's prescribing methods, arguing that "[t]here's no evidence in this case that [Hayes] ever needed any other medication during the time frame that Dr. Hamby was treating him . . . ." That objection strikes us as bizarre, given the evidence Hayes has presented. Furthermore, Hayes showed that he stopped receiving even the minimal treatment of over-the-counter ibuprofen and ice packs in May 2002, right after Dr. Hamby learned from the non-medical prison officials that they were investigating a complaint from Hayes about inadequate medical care. Hayes argues that Dr. Hamby revoked these treatments in retaliation for his complaints. If believed

by a trier of fact, that could factor into a finding that Dr. Hamby was deliberately indifferent to Hayes's condition.

Dr. Hamby's testimony is also revealing with respect to his denials of Hayes's persistent requests to see a specialist in urology. During his deposition, Dr. Hamby was shown a note in Hayes's chart from another physician at Hill, Dr. Shute, who had recommended that Hayes be given a urology referral:

> Q [Hayes's counsel]: . . . And it says referral for urology. Now can you see where it says that?
>
> A [Dr. Hamby]: It says referral for urology work-up.
>
> Q: Okay.
>
> A: Whatever that means.
>
> Q: So you don't know what that means?
>
> A: I have no idea. He didn't fill out any form. He didn't spell out anything.

Here, Dr. Hamby professed to "have no idea" what it means for a physician to write "referral for urology work-up" on Hayes's chart. A trier of fact could reject the assertion that the director of a medical unit is not aware of the meaning of that phrase, as well as the notion that the medical director knows nothing until a subordinate physician fills out a form explaining the concept of a referral to a specialist. Even if some type of form was required before a Hill physician could provide Hayes with an outside referral to a urologist, a fact-finder could infer from Dr. Hamby's responses on this point that he was hostile and dismissive to Hayes's needs. The following exchange is telling:

A [Dr. Hamby]: The limitation for a referral was medical necessity and that's the way it has been and it is everywhere you go. The practice of medicine within the prison system and outside the prison system is essentially the same.

Q [Hayes's counsel]: When you speak of medical necessity, if somebody's having pain, even extreme pain but the pain is not—is not related to a fatal illness or a deteriorating sort of illness, could that pain nonetheless be considered a medical necessity?

A: The pain could be and I emphasize could be listed as a medical necessity if I could document a cause for the pain.

Q: So if somebody were complaining about a severe pain or substantial pain and you couldn't document a cause, then would that person then not—not be able to see a specialist?

A: I wouldn't know which specialist to send him to if I can't come up with a documented cause for pain such as reaching up, grabbing a testicle and pulling it down and having the guy go into spasm. . . . Or something like that. I don't—I don't need to come up with a documented diagnosis. I need to come up with something that I don't know what it is [that] is causing pain that I can document.

These are troubling statements. Dr. Hamby's assertion that a patient's report of extreme pain without a documented cause does not constitute a "medical necessity," and his insistence that a referral to a specialist is not

appropriate when "I don't know what it is [that] is causing the pain," make no sense. The fact that a general practitioner is unable to identify or document the cause of a patient's pain does not strike us as a reason to *reject* a request to see a specialist; indeed, as Hayes's counsel observed, it suggests just the opposite. Dr. Hamby essentially said that he will not refer a patient to a specialist unless he already knows what the problem is (and thus does not need the specialist's input). But the very reason why a specialist would be called in is that a generalist is unable to identify the cause of a particular ailment. If what Dr. Hamby was saying was that no referral was needed because Hayes was not "really" in substantial pain, there is a different problem. That takes us back to the evidence indicating that Dr. Hamby knew of, but disregarded, Hayes's repeated reports of severe, progressively worsening pain. And while Dr. Hamby said, implausibly, that he would not "know which specialist to send [Hayes] to if I can't come up with a documented cause for pain," no one here disputes that the proper specialist for an evaluation of Hayes's testicular pain was a urologist. The record shows that Dr. Hamby knew that Dr. Shute requested a urology referral in 2001, and that as early as September 2000, Dr. Choudry had done a urology work-up and consulted with a urologist about Hayes's case. Hayes's medical records show a universal awareness of the fact that these problems were the domain of a urologist.

Though we could say more, this is enough to show that a reasonable trier of fact could conclude that Dr. Hamby's treatment of Hayes constituted deliberate indifference to

a serious medical need. Summary judgment was there-
fore an inappropriate resolution of Hayes's case against
Dr. Hamby.

2

The position of the non-medical defendants is different.
Here again, our prior decision in *Greeno* is instructive.
Greeno, like Hayes, had complained to non-medical
prison officials, both in letters and by filing formal griev-
ances, that he was receiving inadequate care from the
prison's medical unit. The district court granted summary
judgment or dismissal for all of the defendants. We
concluded that summary judgment was appropriate
for some of them, but not all. When discussing Greeno's
claims against the grievance officer who handled "at least
seven" of Greeno's inmate complaints (Charles Miller, a
non-medical official), we stated:

> Greeno contends that Miller was deliberately indiffer-
> ent to his medical needs because he failed to investi-
> gate the complaints or remedy the medical defen-
> dants' failure to provide appropriate treatment. Our
> review of the record, however, reveals that Miller
> reviewed Greeno's complaints and verified with the
> medical officials that Greeno was receiving treatment.
> We do not think Miller's failure to take further
> action once he had referred the matter to the medical
> providers can be viewed as deliberate indifference.

414 F.3d at 655-56. We went on to adopt the reasoning of
the Third Circuit in *Spruill v. Gillis*, 372 F.3d 218, 236 (3d
Cir. 2004), which held that

[i]f a prisoner is under the care of medical experts . . .
a non-medical prison official will generally be justified
in believing that the prisoner is in capable hands. This
follows naturally from the division of labor within a
prison. Inmate health and safety is promoted by
dividing responsibility for various aspects of inmate
life among guards, administrators, physicians, and so
on. Holding a non-medical prison official liable in a
case where a prisoner was under a physician's care
would strain this division of labor.

372 F.3d at 236. We added that we "decline[d] to extend
responsibility for Greeno's medical care to Miller. Perhaps
it would be a different matter if Miller had ignored
Greeno's complaints entirely, but we can see no
deliberate indifference given that he investigated the
complaints and referred them to the medical providers
who could be expected to address Greeno's concerns." 414
F.3d at 656 (citing *Hernandez v. Keane*, 341 F.3d 137, 148 (2d
Cir. 2003)). *Accord, Johnson v. Doughty,* 433 F.3d 1001, 1012
(7th Cir. 2006).

Like Miller in *Greeno*, the non-medical defendants in
this case investigated Hayes's complaints and referred
them to the responsible medical providers. Hayes recog-
nizes the hurdle that *Greeno* presents, but he argues that his
case is different, because, as *Spruill* recognized, non-
medical officials can "be chargeable with the Eighth
Amendment scienter requirement of deliberate indiffer-
ence" where they have "a reason to believe (or actual
knowledge) that prison doctors or their assistants are
mistreating (or not treating) a prisoner." *Spruill*, 372 F.3d

at 236; see also *Greeno*, 414 F.3d at 655-56; *Johnson*, 433 F.3d at 1012. Here, Hayes argues, Bass and Pierson did have actual knowledge, or at least reason to believe, that the prison doctors were "mistreating (or not treating)" him. He notes that he told Bass about his pain and about the doctors' refusal to respond to his pleas for treatment.

The non-medical defendants counter that they investigated Hayes's complaints, sought reports from medical officials, and relied on the judgment of the prison physicians. They note that although *Greeno* and *Johnson* reversed summary judgments for certain *medical* officials in each case, those cases affirmed the judgments for non-medical defendants because the latter had investigated "and verified with the medical officials that [the inmates were] receiving treatment, and were entitled to rely on the judgments of medical staff."

The question is whether the non-medical defendants had any duty to do more than they did, in light of their knowledge of the situation. We think not. The policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one. Here, the non-medical officials responded readily and promptly to each of Hayes's letters and grievances. They contacted Medical Director Hamby and the administrator, requesting reports and summaries about the care that Hayes had received in order to ensure themselves that his complaints did not require further action. At worst, they may have been negligent in failing to investigate further after receiving the summaries

from the medical staff, but negligence is not deliberate indifference. Because the non-medical defendants were entitled to rely on the professional judgment of medical prison officials, and because nothing in Dr. Hamby's reports made it obvious that Hayes might not be receiving adequate care, the district court correctly granted summary judgment in favor of the non-medical defendants.

C

Before concluding, we must say a word about qualified immunity, because Dr. Hamby argued in the alternative that he was entitled to judgment on that ground. The district court concluded that all of the defendants were entitled to qualified immunity. It based that conclusion solely on its determination that none of the defendants had violated Hayes's Eighth Amendment rights. Because Hayes had "failed to establish the violation of a federal right," the court found, he could not defeat the defendants' claims for qualified immunity. On appeal, Dr. Hamby has not presented an alternative argument to support a finding of qualified immunity. We have rejected the district court's conclusion that Hayes failed to state a claim under the Eighth Amendment, or that he failed to come forward with enough evidence to support such a claim. It has been established for decades that prison physicians violate inmates' constitutional rights when they deliberately disregard an inmate's serious medical condition, and only a trial can resolve the facts that are in dispute.

## III

The judgment in favor of Mark A. Pierson and Wanda L. Bass is AFFIRMED. The judgment in favor of William M. Hamby is REVERSED and REMANDED for further proceedings consistent with this opinion. The costs on appeal shall be divided equally between appellant Hayes and appellee Hamby.