NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 7, 2014[*]
Decided May 7, 2014

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 13-2484

| | |
|---|---|
| SYLVESTER JACKSON,<br>    *Plaintiff–Appellant*, | Appeal from the United States District<br>Court for the Western District of Wisconsin. |
| *v.* | No. 11-cv-774-bbc |
| RANDALL HEPP, et al.,<br>    *Defendants–Appellees*. | Barbara B. Crabb,<br>*Judge.* |

**O R D E R**

Randall Jackson, a Wisconsin inmate, brought this action under 42 U.S.C. § 1983 claiming that a doctor, nurses, and other staff at Jackson Correctional Institution ("JCI")

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

violated the Eighth Amendment by failing to adequately treat his chronic back pain and disregarding an outside podiatrist's instructions for postoperative care after foot surgery. On three occasions Jackson asked the district court to recruit counsel. The court denied each request and eventually granted summary judgment for the defendants, despite characterizing the many gaps in the evidence as troubling. On appeal Jackson challenges the grant of summary judgment as well as the refusal to enlist a lawyer to assist him. Because we conclude that the district court abused its discretion in refusing Jackson's requests for a lawyer, and that Jackson was prejudiced by those refusals, we vacate the judgment and remand for further proceedings.

We recount the evidence at summary judgment in the light most favorable to Jackson. *See Arnett v. Webster*, 658 F.3d 742, 749 (7th Cir. 2011); *Gil v. Reed*, 381 F.3d 649, 651 (7th Cir. 2004). Jackson, who is in his late forties and diabetic, first complained about hip and back pain shortly after his transfer to JCI in November 2009. Kenneth Adler, a prison physician, prescribed ibuprofen and authorized Jackson to have an extra mattress. Dr. Adler later ordered hip X-rays, which showed degenerative disease in the right hip, and prescribed naproxen, a pain reliever. But afterward Jackson complained repeatedly of worsening back pain. In one request for health services, he said that at night the pain was so severe that often he could not walk to the toilet in time. His back pain, says Jackson, kept him awake at night, made sitting for long periods difficult, and sometimes made standing to walk unpleasant.

Over the course of the following year, Jackson saw Dr. Adler several times for his back pain, but the plaintiff insists that the doctor misrepresented in his medical records what transpired during those visits. (At summary judgment Dr. Adler submitted an affidavit, but his account of Jackson's visits appears to rest entirely on the plaintiff's medical records and not the doctor's independent recollection. Dr. Adler does not vouch for the accuracy of the information in Jackson's medical records. Nor does the doctor confront the plaintiff's accusations that statements attributed to him in those records—including records signed by Dr. Adler—are false.) For example, after Jackson's first visit in March 2010, Dr. Adler wrote in the medical records that Jackson was "not taking pain medicines," which Jackson says is untrue. Dr. Adler then prescribed more ibuprofen and an evaluation by a physical therapist. That evaluation did not result in actual *therapy* (apparently the therapist recommended that Jackson perform exercises on his own), yet Dr. Adler wrote after Jackson's next visit in April that his symptoms had improved with physical therapy. And then after a visit in October, Dr. Adler wrote that ibuprofen was helping Jackson's back pain, yet the plaintiff insists that he never said this and, in fact, told the doctor that his pain was worsening and the ibuprofen was not

helping. The doctor even noted in Jackson's medical records that he lifts weights and plays basketball daily, which Jackson denies having said and explains would have been impossible since JCI inmates are not granted daily recreation privileges.

Meanwhile, in December 2010, Debra Tidquist, a nurse practitioner, ordered a back X-ray that showed, according to Jackson's medical records, degenerative changes. Tidquist declared, however, that "additional treatment" was unnecessary. Jackson disagreed and continued complaining that his back pain was "severe" and sometimes "unbearable." Around the same time Tidquist also ordered a second evaluation by a physical therapist and prescribed gabapentin, a drug used to relieve pain from nerve damage. Not until April 2011 did Jackson see the physical therapist, and, as before, he did not receive therapy after the evaluation. And when Jackson told Tidquist that the gabapentin was not working, her response was to substitute prescription-strength acetaminophen.

As far as this record shows, Dr. Adler and Nurse Practitioner Tidquist did not investigate other treatment options or consider sending Jackson to a specialist. And though the plaintiff requested care for his back pain at least 14 times during 2011, there is scant indication in the record that anything was done before October, not even after Jackson had reported that his back condition caused him to fall against the sink in his cell. Indeed, on eight occasions from May to October he was told that a medical appointment had been scheduled but then was not called to the infirmary. Eventually, in November 2011, Tidquist ordered another back X-ray; this time she diagnosed mild osteoarthritis but again declared that treatment was not indicated.

Jackson's back pain was not his only ailment during this time. Since late 2009 the medical staff also had been treating recurring infections in his big toes, which led to surgical removal of both nails at a hospital in April 2011. The podiatrist instructed that Jackson's feet be soaked in soapy water daily for four to six weeks. After the surgery Jackson was taken back to JCI, where a defendant nurse—he does not say which—refused to bring a wheelchair or provide open-toe shoes and instead forced him to don heavy boots and hustle a significant distance to his cell on foot.

For the next two days, Jackson was called to the infirmary, where nurses Georgia Kostohryz and Cheryl Marsolek soaked his feet as directed. But then two days passed without a call from the infirmary, so on the fifth day after his return from the hospital Jackson complained to Nurse Practitioner Tidquist. That complaint prompted Kostohryz and Marsolek to give Jackson a foot tub, soaking solution, ointment, and

dressing and tell him to tend to his feet himself in his cell. He did for 13 days until the tub and supplies were taken away when he was moved to a segregation cell. Jackson notified Tidquist that he needed infirmary staff to resume performing the daily soaks, and after hearing nothing for three days, he complained to Tammy Maassen, the manager of the Health Services Unit at JCI. That same day, May 5, Kostohryz told him that additional soaks were unnecessary. On May 6, after Jackson had replied that Kostohryz and Marsolek were not authorized to disregard the podiatrist's instructions, the plaintiff was taken to the infirmary. Dr. Adler entered the room and declared—after a quick glance at his feet, says Jackson—that further soaks were unnecessary because his toes were healed.

This was 22 days after Jackson's surgery. During those three weeks his feet had been soaked as prescribed on only 15 days, and all but five of those days by Jackson himself. Moreover, by the time Dr. Adler countermanded the podiatrist's instructions on May 6, five days had passed since staff last followed those instructions. Then on May 8, two days after the doctor's appearance, Jackson requested medical attention because both toes were seeping blood and pus and the right toe was causing him throbbing pain. Nurse Betty Peterson refused to schedule an exam, explaining that Jackson, who still was in segregation, had just seen Dr. Adler two days before. That evening Nurse Kostohryz refused to look at Jackson's feet when she made her rounds, and the next day a guard informed him that Marsolek and another nurse, Greg Meier, had said he should wash off the blood and pus and wait for a call from the infirmary. He was taken there the next day and seen first by Carla Griggs, a nurse, and then by Dr. Adler. This time, says Jackson, the doctor did not even glance at his feet before pronouncing them "well healed" and leaving the room.

During the next six days Jackson's toes worsened but his requests for attention went unheeded. A guard, Kevin Clark, said he "did not give a shit" when Jackson showed him the blood and pus and asked him to contact the infirmary. The plaintiff also asked Nurse Marsolek to schedule an infirmary visit; at summary judgment Marsolek averred that Jackson had refused to see anyone except Nurse Practitioner Tidquist, who was on leave, but in fact, says Jackson, he accepted an appointment with Dr. Adler on May 16. During that appointment, Nurse Griggs consulted Dr. Adler before taking a culture and sending Jackson on his way. A day later the lab confirmed that his toes were infected. Dr. Adler finally prescribed an antibiotic, but it was not until May 20 that Tidquist reinstated the daily foot soaks, after Jackson had complained that his back condition made washing his feet in his cell sink painful.

When he filed suit Jackson raised many claims that were not joined properly with those concerning his back pain and postoperative care for his toes. After the district court alerted him about the misjoinder, Jackson elected to proceed against Dr. Adler; Nurse Practitioner Tidquist; Nurses Kostohryz, Marsolek, Peterson, Meier, and Griggs; guard Clark; and HSU manager Maassan. Jackson also named as defendants the then-Secretary of the Department of Corrections, then-warden Randall Hepp, and a grievance officer, all of whom he had complained to directly. At screening, *see* 28 U.S.C. § 1915A, the court allowed him to proceed with his Eighth Amendment claims against all of these defendants.

Soon after his complaint was screened, Jackson filed his first of three motions requesting recruitment of counsel, asserting that his case was complex because of the nature of his claims and number of defendants involved. The district court denied his request, explaining that it was too early in the proceedings to tell whether Jackson lacked the ability to litigate his case. Jackson renewed his motion eight months later, adding that he had been placed on an antidepressant and psychiatric medication, which made it difficult for him to focus. He also argued that his claims of deliberate indifference likely would require expert testimony, and that a lawyer's help would be needed to highlight misrepresentations by the defendants. The district court again denied his motion, this time reasoning that Jackson's submissions so far had been coherent and showed that he could understand court instructions. In Jackson's third motion, filed after the defendants had moved for summary judgment, he renewed his earlier arguments, and stated that he had been moved to segregation and could not contact and interview witnesses at JCI. Again the district court denied his request, explaining that Jackson's "situation" had not changed enough from when the court denied his prior motion.

On appeal Jackson contests the denials of his requests for counsel, as well as the entry of summary judgment. We agree with him that the district court should have recruited a lawyer, though we also have doubts that granting summary judgment was appropriate on the existing record. Jackson argues that he needed a lawyer because the case turned on whether his or the defendants' versions of his treatment were correct, he was on "psych" medication during the proceedings, and he could not effectively litigate whether the level of treatment he *did* receive was adequate. We review the district court's decision not to recruit counsel for an abuse of discretion. *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013); *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc).

When a plaintiff makes a reasonable attempt to obtain counsel, the district court must evaluate whether the factual and legal difficulty of the case exceeds that plaintiff's ability to litigate it. *Navejar*, 718 F.3d at 696; *Bracey v. Grondin*, 712 F.3d 1012, 1016 (7th Cir. 2013). The defendants do not dispute that Jackson suffered from objectively serious medical conditions. Thus, to survive summary judgment on his Eighth Amendment claims, Jackson needed evidence establishing that the care he received for his chronic back pain and for his feet after surgery was so inappropriate that a jury reasonably could find that the defendants intentionally disregarded risks to his health, *see Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008), or unnecessarily prolonged his pain, *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Constitutional claims that depend on the state of mind of a defendant or that turn on witness credibility may be too complex for a pro se plaintiff to litigate. *Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010); *Swofford v. Mandrell*, 969 F.2d 547, 552 (7th Cir. 1992). Complexity must be assessed with an eye toward the plaintiff's education, literacy level, psychological history, and litigation experience. *See Santiago*, 599 F.3d 749 at 762.

Although it may be that Jackson could follow instructions from the court, that does not mean he also was able to engage in discovery effectively, especially in a case where medical evidence from outside experts is likely to be critical. Moreover, when Jackson submitted his second request, he was taking psychiatric medications that made it difficult for him to focus. And by the time he made his third request, he was hampered in responding to the defendants' motion for summary judgment because he was housed in segregation. The district court's observation about the gaps in the evidence, and Jackson's inability to exploit those gaps in fending off the defendants' motion for summary judgment, show why help from counsel was essential.

Jackson has shown a reasonable likelihood that a lawyer would have made a difference in the outcome of his case. Even where a district court has abused its discretion in declining to recruit counsel, we will reverse only if the plaintiff has shown he was prejudiced by that denial. *Navejar*, 718 F.3d at 696; *Bracey*, 712 F.3d at 1017. The defendants assert that Jackson has waived any argument that the denial of counsel prejudiced him. We disagree; in his brief to this court, Jackson argues that the absence of a lawyer inhibited his ability to challenge the adequacy of the treatment he *did* receive, and to identify and contact witnesses who were not present at JCI.

Jackson needed the assistance of counsel, and it is clear that he was prejudiced by the absence of a lawyer. Accordingly, we VACATE the grant of summary judgment for the defendants and REMAND for further proceedings.