In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2166

GARY ORLOWSKI, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MILWAUKEE COUNTY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin
No. 13-cv-1318 — **Pamela Pepper,** *District Judge.*

ARGUED NOVEMBER 7, 2016 — DECIDED SEPTEMBER 18, 2017

Before EASTERBROOK and WILLIAMS, *Circuit Judges* and
FEINERMAN, *District Court Judge*.*

WILLIAMS, *Circuit Judge*. Alexander Orlowski died of a
methadone overdose while in custody at the Milwaukee
County House of Correction. Before his death, correctional of-
ficer Irby Alexander observed Orlowski sleeping and was

<hr>

* Of the Northern District of Illinois, sitting by designation.

concerned that he was having a difficult time breathing. Alexander tried to wake Orlowski up, but was unable to do so, so he called to inform his supervisor, Sergeant Anthony Manns, about the situation. They decided not to call for medical attention. Three hours later, Orlowski was dead.

Orlowski's estate (the "Estate") and his father, Gary Orlowski ("Gary"), filed this lawsuit pursuant to 42 U.S.C. § 1983 claiming that Alexander and Manns violated Orlowski and Gary's constitutional rights. The district court rejected all claims and granted summary judgment in favor of Alexander and Manns, and determined that evidence was insufficient to sustain the Estate's Eighth Amendment claim. The court also concluded that there was no evidence Alexander or Manns intended to deprive Gary of his relationship with his son, so his Fourteenth Amendment substantive due process claim failed. This appeal followed.

We affirm in part and reverse in part. The record demonstrates that there is a material dispute of fact as to whether Alexander and Manns were deliberately indifferent to Orlowski's severe medical condition. It is up to the jury to determine the credibility of witnesses and weigh the evidence, and there is sufficient evidence to go to trial here. So we reverse the district court's judgment on the Estate's Eighth Amendment claim. However, we agree with the district court that the law of this circuit forecloses Gary Orlowski's Fourteenth Amendment substantive due process claim. Because there is no evidence that Alexander or Manns intentionally interfered in Gary's familial relationship with his adult son, summary judgment was appropriate.

## I. BACKGROUND

### A. Factual History

Taking the facts and evidence in the light most favorable to the non-moving party, the following occurred on November 22, 2007.

Twenty-year-old Orlowski was an inmate at the Milwaukee House of Correction ("HOC") where he resided in the Zebra-2 dorm. Just past midnight, he was asleep in his bunk when dorm supervisor Irby Alexander began his shift. Alexander had no prior experience with Orlowski, and had not observed Orlowski sleeping (or awake) before. At approximately 12:28 a.m., as was his routine duty for the night, Alexander conducted a security check of the dorm, and did not notice anything unusual. He conducted another security check at 1:36 a.m., and again saw nothing unusual. Another HOC official, Sergeant Anthony Manns, also toured the dorm around the same time, and did not note anything unusual.

At approximately 3:45 a.m., Alexander received a call from the HOC kitchen to request workers for the morning's breakfast, so he began awakening inmates for kitchen duty. Orlowski was one of the kitchen workers, but when Alexander got to Orlowski's bunk, he was troubled by what he saw. Orlowski was breathing abnormally, making noises from hard and loud to very soft, and "at times his body would make sudden moves and he would again start breathing loudly." Larry Green, another inmate residing in a nearby bunk, tried to wake Orlowski up, but Orlowski would not wake up. Green, who was a chef for HOC's breakfast, was concerned because Orlowski had always gotten up for work in the kitchen, so he told Alexander that something was

wrong with Orlowski. Because Green persisted in voicing his concern for Orlowski, Alexander (or another HOC official) disciplined him by putting him in the "hole."

Alexander was concerned. He thought that Orlowski might have a sleep disorder such as sleep apnea because of his "intermittent-type breathing" and because he stopped breathing at times. Alexander tried to wake him by shaking his bunk and calling his name. How forcefully Alexander was trying to wake Orlowski is unclear, but Orlowski responded, at most, with changed breathing patterns and slight movement. Despite Alexander's efforts to wake him up, Orlowski remained unconscious and unresponsive. Alexander left him in his troubled state. However, when he returned to his desk, Alexander noted in the Zebra-2 dorm logbook:

> Z2 Orlowski #719775403 appears to [have] a severe sleeping disorder. Inmate appears not to be breathing at times. Inmate makes a lot of noise while trying to breath [sic] and[/]or when he is breathing. Inmate appears to have a lot of difficulties sleeping.

Alexander then called his supervisor, Sergeant Manns. Alexander told him everything written in the log book, including Orlowski's trouble breathing. However, Manns denies that Alexander told him this information, asserting that if Alexander had told him Orlowski appeared to have a severe sleeping disorder and was not breathing, he would have called for a medical emergency. But, either way, no medical emergency was called. Instead, Mann told Alexander that if Orlowski woke up for breakfast or later in the morning, they would talk to him.

At 4:05 a.m., Alexander announced that it was breakfast time in Zebra-2, and at 4:20 a.m., the inmates went to breakfast. Orlowski, who had missed his kitchen duty, did not wake up for the scheduled breakfast and remained in bed.

At 4:35 a.m., HOC Corrections Manager, Virginia Ertman, toured the Zebra-2 dorm, and read Alexander's log book entry regarding Orlowski's condition. Alexander took her to Orlowksi's bunk and they observed him in the same state. Alexander told Ertman that he had told Manns about the issue, and that Manns would speak with Orlowski after breakfast.

Time passed and nothing was done. Alexander observed Orlowski at 4:55 a.m. and again at 5:48 a.m. in the same state. At approximately 6:10 a.m., the inmates returned from breakfast and Alexander heard someone shouting "man down, man down!" near Orlowski's bunk. Alexander went to investigate, and saw Orlowski, who looked dead. Alexander then called a medical emergency, and the medical unit came and attempted CPR and defibrillation, but it was too late. Orlowski was pronounced dead at 6:54 a.m. The cause of his death was a methadone overdose, caused by pills Orlowski had purchased from another inmate. According to medical experts, Orlowski would have survived and made a full recovery if he had received medical care between 3:45 and 5:48 a.m.

## B. Procedural History

On November 21, 2013, Alex Orlowski's estate (the "Estate") and his father, Gary (collectively the "Plaintiffs"), brought this civil suit against Milwaukee County, Irby Alexander, Anthony Manns, Ronald Malone, and Wisconsin County Mutual Insurance Corporation. Before the summary

judgment motion was filed, the Plaintiffs dropped their claims against Malone and the Wisconsin County Mutual Insurance Company, and two of their *Monell* claims against Milwaukee County.

At summary judgment, the district court granted judgment in favor of the remaining defendants (Manns, Alexander, and Milwaukee County) on all of the Plaintiffs' remaining claims. This appeal followed, and Plaintiffs challenge the district court's decision on two claims: (1) the Estate's Eighth Amendment claim that Alexander and Manns were deliberately indifferent to Orlowski's serious medical condition; and (2) Gary's Fourteenth Amendment substantive due process claim that Alexander and Manns interfered with his familial relationship with his son. The Estate did not appeal its *Monell* claims against Milwaukee County. The Plaintiffs further requested remand of their indemnification claim against Milwaukee County for claims surviving summary judgment pursuant to Wis. Stat. § 895.46.

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*, reviewing the evidence in the light most favorable to the non-moving parties, here the Plaintiffs. *McDonald v. Hardy*, 821 F.3d 882, 885 (7th Cir. 2016). Summary judgment is only appropriate where, "construing the record in the light most favorable to the party opposing summary judgment, no jury could reasonably find in favor of that party." *Id.* at 888 (citing *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016)).

### A. Defendants Not Entitled to Qualified Immunity

The first question we must address is whether Alexander and Manns ("Defendants") are entitled to qualified immunity. Qualified immunity protects public officials, like Alexander and Manns, from suit where their challenged actions were reasonable mistakes made while performing their jobs. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). However, a public official's immunity is not absolute, and no immunity exists where: (1) his or her conduct violates a plaintiff's constitutional or statutory right; and (2) the right was clearly established at the time of the violation such that a "reasonable official would understand what he is doing violates that right." *Id.* (quoting *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)) (internal quotation marks and additional citation omitted). For a right to be clearly established there does not have to be a prior case that is indistinguishable from the current case; instead, what is required is that the officials were on notice that their conduct was a constitutional or statutory violation. *See Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006). We consider Defendants' assertion of qualified immunity *de novo*, and draw all factual inferences in favor of Plaintiffs. *Findlay*, 722 F.3d at 899.

For purposes of qualified immunity analysis, we focus on the Estate's claim that the Defendants violated Orlowski's Eighth Amendment rights by being deliberately indifferent to his serious medical needs.[2] "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary

---

[2] Plaintiff Gary Orlowski also argues that qualified immunity should not bar suit with respect to his substantive due process claim. But because

and wanton infliction of pain,' proscribed by the Eighth
Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (cita-
tion omitted). And, as we discuss more below, we find there
is sufficient evidence to raise a triable issue of fact with respect
to whether or not Defendants violated this constitutional
principle.

So, we turn to the second prong—whether the constitu-
tional violation was "clearly established." The violation al-
leged by the Estate is "clearly established" if Alexander and
Manns had fair and clear warning that their alleged actions
(or inaction) would be constitutionally offensive. We find
that, assuming the facts most favorable to the Estate, they did.
Correctional officials have long been warned that they cannot
ignore an inmate's known serious medical condition. *Bd. v.
Farnham*, 394 F.3d 469, 485 (7th Cir. 2005) ("[T]he right to re-
ceive adequate treatment for serious medical needs is a clearly
established constitutional right."). Where a duty imposed by
law is obvious to a reasonable officer, we consider it "clearly
established." *See White v. Pauly*, 137 S. Ct. 548, 552 (2017).
Here, the Estate's evidence indicates that Orlowski presented
obvious symptoms of a serious medical condition. So, if we
accept these facts as true, any reasonable officer would know
he had a duty to seek medical attention.  If Alexander and
Manns chose to do nothing despite this duty,[3] they violated
"clearly established" Eight Amendment law.

---

Defendants did not raise qualified immunity as a defense below, we find
it is waived and we address the merits of this claim infra.

[3] We note that there is conflicting evidence regarding what Alexander
communicated to Manns that could impact qualified immunity analysis.
If, as Alexander testified, he told Manns everything he witnessed and was

Defendants' construction of the "clearly established" law at issue here is narrow to the point of meaninglessness. Defendants assert that there is no clearly established right for "a convicted prisoner to be awoken and told that he is snoring or breathing irregularly" or "to receive immediate medical attention simply because he is snoring or breathing inconsistently in his sleep." This inaccurately construes the Estate's claim. We cannot assume the Defendants' version of the facts that Orlowski was only snoring. The Estate provides evidence that Alexander knew, and told Manns, that Orlowski was breathing irregularly, appeared to have a severe sleeping disorder, and could not be woken up. Any reasonable officer would know that these observations indicated a serious medical condition and the law required them to seek medical attention. But, Alexander and Manns instead ignored Orlowski's condition. Because the facts proffered by the Estate could demonstrate a violation of Orlowski's clearly established Eighth Amendment rights, factual disputes prevent a finding that Defendants are entitled to qualified immunity.

## B. Material Dispute of Fact for Eighth Amendment Failure to Provide Medical Care Claim

The Supreme Court has made clear that the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment includes a prohibition on deliberate indifference to the serious medical needs of prisoners. *Estelle*, 429 U.S. at

---

instructed to do nothing by his superior, Alexander may be entitled to immunity. However, if Alexander chose not to tell Manns the extent of Orlowski's medical distress, he cannot claim qualified immunity for deferring to a supervisor. This factual dispute forecloses summary judgement in favor of either Alexander or Manns, and the question of which official, if either, violated clearly established law remains to be decided by a jury.

104. To establish such a claim, the Estate must demonstrate (1) Orlowski's condition was objectively serious; and (2) the Defendants were deliberately indifferent to his health or safety. *Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006).

### 1. Orlowski Presented Evidence of Serious Medical Condition

A serious medical condition is one that "has been diagnosed by a physician … or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)) (internal quotation marks omitted). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (citing *Reed v. McBride,* 178 F.3d 849, 852 (7th Cir. 1999)).

In hindsight, we are painfully aware of how serious Orlowski's medical condition was because his methadone overdose led to an untimely death. However, we must look at Orlowski's medical condition as Alexander observed it and possibly reported it to Manns, before Orlowski's health took a fatal turn. Orlowski was not diagnosed with sleep apnea, a drug overdose, or any other serious medical condition before his death. Instead, the Estate asserts that the serious medical condition was obvious. We find that there is sufficient evidence to create a material dispute as to whether it was.

A condition can be "obvious" to a layperson even where he or she is unable to diagnose or properly identify the cause of an observed ailment. Because the Defendants here were not

medical professionals, we focus on their observations to determine whether a jury could find Orlowski's condition objectively serious. The record contains ample evidence that Alexander observed a situation that he, as a layperson, identified as concerning, and which lead him to guess a diagnosis of a serious health condition, sleep apnea. While sleep apnea can result in death, the seriousness of sleep apnea is not the question to be decided. In fact, Orlowski did not have sleep apnea. What is important is that Alexander saw tell-tale signs of a serious medical condition including that Orlowski was breathing inconsistently and would not regain consciousness despite Alexander banging on his bunk and calling to wake him up. Failure to breathe and failure to regain consciousness are undoubtedly life-threatening medical conditions that are obvious to a layperson. Further, there is additional evidence that at least one inmate emphatically told Alexander that something was very wrong with Orlowski. Alexander was clearly concerned enough by what he saw to report Orlowski's symptoms to his supervisor, Manns. The Estate's evidence is sufficient to survive summary judgment on this issue.

## 2. Orlowski Presented Evidence of Defendants' Deliberate Indifference

The test for deliberate indifference is a subjective test, and to survive summary judgment, the Estate needed to show evidence that the officials were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that they actually drew the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Gayton*, 593 F.3d at 620 (the "deliberate indifference" prong is met where "[t]he official must have subjective knowledge of the risk to

the inmate's health, and the official also must disregard that risk"). This standard exists between the standards of negligence and intent. *See McDonald*, 821 F.3d at 888; *see also Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). "Even if a defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton*, 593 F.3d at 620 (quoting *Farmer*, 511 U.S. at 843). Whether an official was deliberately indifferent is a question of fact. *See id.*

We start by looking at whether there was evidence that Alexander was deliberately indifferent. The Estate provides evidence that beginning before 4:00 a.m., Alexander became aware of facts that alerted him to a serious risk of serious harm. He saw Orlowski struggling to breathe, making "sudden moves," and making loud sounds. He approached Orlowski and tried to wake him up, but even with his name called and bed shaken, Orlowski did not regain consciousness. Green told Alexander that there was something wrong with Orlowski.[4] There is also evidence that Alexander drew the inference that Orlowski might have a serious medical condition, including his log book entry noting that Orlowski had a "severe sleeping disorder" and was "not breathing at times" and reported his observations to his supervisor, Manns (though it is unclear what he told Manns). Accordingly, the Estate provides some evidence that Alexander subjectively knew Orlowski was suffering a serious medical condition.

---

[4] While a police report in the record indicates that more than one inmate reported concerns about Orlowski's health to Alexander and witnessed Orlowski's serious medical condition, we are unable to consider these statements at summary judgment because they are inadmissible hearsay. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016).

The more difficult question is whether Alexander disregarded Orlowski's serious medical condition. Evidence in the record suggests that Alexander witnessed Orlowski's intermittent breathing, thought he had a "severe sleep disorder," and remained unconscious despite attempts to wake him up. In response to his concern, he wrote notes in a log book and reported his concern to Manns and later discussed it with Ertman, two supervisors with no medical training or expertise. The evidence does not show that he told either of these supervisors of his failed attempt to awaken Orlowski or about the other inmate's concern for Orlowski's health.

We find that there are factual disputes with respect to whether Alexander was deliberately indifferent. A jury could credit Green's testimony that he persisted in telling Alexander that there was something unusual and frightening about how Orlowski was sleeping that night, and that Alexander opted to send Green to the "hole" rather than call for medical attention for Orlowski. Or a jury could credit Alexander's testimony that other inmates told him Orlowski always slept this way. It would be reasonable for a jury to find that the Estate's evidence proves that Alexander knew or suspected that Orlowski's condition was imminently dangerous yet allowed it to persist for several hours without informing a medical professional or even telling other officers about Orlowski's inability to regain consciousness. This would be deliberate indifference. Failing to consult or alert a medical professional where an inmate is unconscious and barely breathing "surpasse[s] mere negligence and enter[s] the realm of deliberate indifference." *Gayton*, 593 F.3d at 624. Nothing in the record indicates that it would have taken any great effort to alert a medical professional here, and the record is clear that had Alexander done so, Orlowski would have survived.

Similarly, there is evidence that Manns was deliberately indifferent to Orlowski's medical condition. Viewing the evidence in the light most favorable to the Estate shows that Manns was aware of Orlowski's intermittent breathing and limited responsiveness (if not complete unresponsiveness) because Alexander told him.[5] Manns stated that he would have immediately called for medical attention if he was aware that Orlowski was not breathing. However, a jury could credit Alexander's testimony and infer that Manns was fully aware of Orlowski's serious medical condition and failed to take action. Instead, Manns, without visiting the inmate identified as at risk or notifying someone with medical training, postponed any potential investigation until when (and if) Orlowski woke up for breakfast. It would be reasonable for a jury to find this crossed the line from negligence to deliberate indifference. Therefore, we conclude that there are material disputes of facts that foreclose summary judgment on the Estate's Eighth Amendment claims against both Alexander and Manns.

Defendants note that the district court was correct to rely on another district court opinion, *Estate of Crouch v. Madison County*, 682 F. Supp. 2d 862 (S.D. Ind. 2010), in finding that there was insufficient evidence to show Defendants were deliberately indifferent here. However, we find that case is unhelpful. In *Estate of Crouch*, the record provided that the plaintiff exhibited several symptoms that could have led officials to conclude that he was suffering from drug use, but found

---

[5] As noted by the district court, Manns testified that he believed Alexander called him because other inmates were complaining about Orlowski's snoring and not to report a medical problem. This is directly contradicted by Alexander's testimony, which further supports that factual disputes remain for fact-finders to weigh at trial.

the officers did not have sufficient facts to draw an inference of a need for medical attention before they found him unresponsive. *Id.* at 871–72. When they later found him unresponsive, they "immediately addressed the obviously dire situation." *Id.* at 871. Here, the facts proffered by the Estate show that Alexander found Orlowski unresponsive, yet failed to take necessary immediate action. Such facts are easily distinguished from the facts found in *Estate of Crouch*.

### C. No Violation of Due Process in Gary Orlowski's Loss of Familial Relationship with Adult Son

Orlowski's father, Gary, also appeals the district court's judgment dismissing his loss of familial relationship claim. Gary asserts that the Defendants violated his substantive due process rights by interfering with his relationship with his son, who was 20 years old. This court does not recognize "a constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action." *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005). But we view the facts in the light most favorable to Gary in considering whether he met his burden to withstand summary judgment.

Gary's argument that Orlowski was not an adult at the time of his death is not persuasive. While it is true that levels of maturity can differ drastically between 20-year-olds, the law makes clear that the age of majority is 18, and therefore Orlowski was an adult. *See* Wis. Stat. § 990.01(3). The record is undisputed that Orlowski lived at home and was financially dependent on Gary before his incarceration, but nothing in the record indicates that Orlowski could not function

as an adult. In fact, he was serving time in an adult facility,[6] for a crime he committed as an adult. While Gary may have been an exceptionally helpful and supportive parent, this does not lower the age of majority, nor blur the court's view of Orlowski's adulthood. Because Orlowski was an adult, Gary was required to provide evidence of the Defendants' intent to interfere with the familial relationship. No such evidence exists in the record, and the district court properly found that Gary's substantive due process claim cannot withstand summary judgment.

### III. CONCLUSION

The decision below is REVERSED with respect to the Estate's Eighth Amendment claim against Alexander and Manns, and AFFIRMED with respect to Gary Orlowski's substantive due process claim. The Estate's indemnity claim against Milwaukee County pursuant to Wis. Stat. § 895.46 is remanded as its outcome is dependent on the success of the Estate's Eighth Amendment claim at trial.

---

[6] We note that juveniles incarcerated in adult facilities are not adults for the purposes of similar analysis.