

FILED

Feb 24 2020, 5:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Mary Jane Lapointe
Daniel Lapointe Kent
Lapointe Law Firm, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE –
INDIANA DEPARTMENT OF
CORRECTION

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES –
CORIZON, INC. AND THE
CORIZON MEDICAL
EMPLOYEES

Carol A. Dillon
Christopher Andrew Farrington
Bleeke Dillon Crandall, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Sue Williams, Linda Wood, and Claude Wood, as the Co-Personal Representatives of the Estate of Rachel A. Wood, Deceased,

*Appellants-Plaintiffs,*

v.

Indiana Department of Correction, Corizon, Inc., Georgeanne R. Pinkston, Dawn Renee Antle, Mary D. Grimes, Tina Icenogle, Daniel P. Rains, M.D., Richard M. Hinchman, M.D., and Vance Raham, M.D.,

*Appellees-Defendants.*

February 24, 2020

Court of Appeals Case No. 19A-CT-1832

Appeal from the Marion Superior Court

The Honorable John M.T. Chavis, II, Judge

Trial Court Cause No. 49D05-1401-CT-1478

**Najam, Judge.**

# Statement of the Case

In April of 2012, Rachel A. Wood, then an inmate in the Indiana Department of Correction ("DOC"), died from complications relating to lupus and a blood clotting disorder. Her Estate, through its personal representatives ("the Estate"), sued the DOC; the DOC's for-profit contractor for medical services at the DOC's prisons, Corizon, Inc. ("Corizon"); and Corizon employees Dr. Richard M. Hinchman, Dr. Vance Raham, Dr. Daniel P. Rains, Nurse Practitioner Dawn Renee Antle, Nurse Practitioner Georgeanne R. Pinkston, Registered Nurse Mary D. Grimes, and Registered Nurse Tina Icenogle

(collectively, "the Corizon medical employees").[1] In its complaint, the Estate alleged, pursuant to 42 U.S.C. § 1983, that Corizon and the Corizon medical employees had violated Wood's federal civil rights under the Eighth Amendment to the United States Constitution when they were deliberately indifferent to her serious medical conditions while she was in their care. The Estate further alleged that the DOC was negligent under Indiana law in failing to monitor its contractor. The trial court entered summary judgment for the DOC, Corizon, and the Corizon medical employees.

[2] On appeal, the Estate raises four issues for our review, which we restate as whether genuine issues of material fact preclude the entry of summary judgment. We affirm the trial court's entry of summary judgment for the two registered nurses—Nurse Grimes and Nurse Icenogle—as there is no designated evidence to show that they breached the standard of care relevant for registered nurses, let alone acted with deliberate indifference toward Wood. Accordingly, the trial court properly entered judgment as a matter of law for Nurse Grimes and Nurse Icenogle.

[3] But the designated evidence most favorable to the Estate tells a much different story for the medical doctors and the nurse practitioners. For them, we hold that the designated evidence readily demonstrates genuine issues of material

---

[1] The Estate does not appeal the trial court's entry of summary judgment for Dr. Michael Mitcheff, Cassidy Anderson, Carolyn Barnes, Linda Benton, Carmel Billman, Jared Caudill, Deborah Cravens, Jana Cuffel, Sheilah Ferguson, Lynette Lees, Bruce Lelak, Jennie Mauck, Pamela Sue Moore, Tiffany Rutherford, Janell Sanders, Carmen Shilling, or Elizabeth Vinup.

fact on the Estate's claims of deliberate indifference. Indeed, this is not a close case under Indiana's summary judgment standards. The designated evidence would support a reasonable inference and a finding that these medical doctors and nurse practitioners were actually aware of a substantial risk of serious harm Wood faced as a result of her serious medical conditions, yet they acted, in the words of the Estate's medical experts, with "a severe and callous disregard for [Wood's] clinical status" and rendered treatment that was "inappropriate," "catastrophic," showing "absolutely no interest" in Wood's health, "quite suspect," "dismiss[ive]," and "clearly . . . below the standard of care." Appellant's App. Vol. VI at 16-18, 24.

[4] Accordingly, we reverse the entry of summary judgment for those Corizon medical employees, for Corizon, who has been sued under the doctrine of *respondeat superior*, and for the DOC, which failed to discover Wood's facially inconsistent medical records, her nonexistent treatment plans, or Corizon's "completely and totally inadequate" medical settings. *Id.* at 17. We therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## Facts and Procedural History

*Background*

[5] Wood was twenty-two years old in June of 2010 when she was convicted of her first criminal offense, dealing in a controlled substance. She was incarcerated in the Huntington County Jail while she awaited her sentencing, and at her

sentencing the court ordered her to serve a term of incarceration in the DOC. At all times during her ensuing incarceration, Corizon, a for-profit corporation, was under contract with the DOC to provide medical services at the relevant DOC correctional facilities.

[6] That contract required Corizon to provide medically appropriate care to inmates; maintain records "for contract monitoring" by the DOC; and comply with the DOC's written health care services directives. Appellant's App. Vol. V at 231. The DOC's health care services directives, in turn, required, among other things, that Corizon establish and maintain plans for the treatment of inmates, which were to be "formal written plans that identify serious health conditions referenced from [a master] problem list, describe goals and outcomes, list the planned interventions, and describe which professional discipline is responsible for carrying them out." Appellant's App. Vol. VI at 129, 131. For "serious conditions," treatment was to be "in a consistent and continuing fashion" with "a structured process." *Id.* at 133.

[7] In July of 2010, the county jail transferred Wood to the DOC. In doing so, the county jail submitted a summary of Wood's medical records. And, upon intake with the DOC, Wood self-reported her medical history. Those documents demonstrated that Wood had a history of lupus, "a bleeding . . . [and] clotting disorder," and kidney trouble, and she had been prescribed numerous

medications related to those disorders. Appellant's App. Vol. III at 76, 82-83. In relevant part, Wood had been prescribed hydroxychloroquine[2] and warfarin.[3]

[8] Hydroxychloroquine is a prescription medication for lupus. *Hydroxychloroquine (Oral Route)*, Mayo Clinic (Feb. 17, 2020), mayoclinic.org/drugs-supplements/hydroxychloroquine-oral-route/description/drg-20064216/ [https://perma.cc/QB9C-WWAY]. Lupus is a "systemic autoimmune disease that occurs when your body's immune system attacks your own tissues and organs." *Lupus*, Mayo Clinic (Feb. 17, 2020), mayoclinic.org/diseases-conditions/lupus/symptoms-causes/syc-20365789/ [https://perma.cc/BXN6-SWMK]. Lupus is often indicated by "flares" of "unexplained rash[es]," especially on the face; "ongoing fever"; "persistent aching"; or "fatigue." *Id.* Among other complications, lupus "can cause serious kidney damage," including "kidney failure," and it can affect the central nervous system: "[i]f your brain is affected by lupus, you may experience headaches, dizziness, behavior changes, vision problems," or "have difficulty expressing" thoughts. *Id.* Lupus may also "lead to blood problems, including . . . increased risk of bleeding or blood clotting." *Id.* Wood's prescription for warfarin was, in turn,

---

[2] Wood's medical records often use the brand name Plaquenil to refer to the hydroxychloroquine prescription. *See Hydroxychloroquine (Oral Route)*, Mayo Clinic (Feb. 17, 2020), mayoclinic.org/drugs-supplements/hydroxychloroquine-oral-route/description/drg-20064216/ [https://perma.cc/QB9C-WWAY]. Also, we reject Corizon and the Corizon medical employees' arguments on appeal that we cannot take judicial notice of the Mayo Clinic's website of general facts relating to diseases, their symptoms, and their common medications. *See* Ind. Evidence Rule 201(a)(1)(B).

[3] Wood's medical records often use the brand name Coumadin to refer to the warfarin prescription. *See Warfarin (Oral Route)*, Mayo Clinic (Feb. 17, 2020), mayoclinic.org/drugs-supplements/warfarin-oral-route/description/drg-20070945/ [https://perma.cc/Z8C8-3UM9].

"used to prevent or treat blood clots . . . ." *Warfarin (Oral Route)*, Mayo Clinic (Feb. 17, 2020), mayoclinic.org/drugs-supplements/warfarin-oral-route/description/drg-20070945/ [https://perma.cc/Z8C8-3UM9].

*Rockville Correctional Facility*

[9] On July 9, 2010, the DOC received Wood at the Rockville Correctional Facility ("Rockville"). Corizon medical employees Dr. Raham and Nurse Practitioner Pinkston[4] were responsible for Wood's medical care at Rockville.

[10] Upon intake, Nurse Practitioner Pinkston acknowledged "[m]edical documentation received from Huntington County." Appellant's App. Vol. III at 87, 89. Nurse Practitioner Pinkston further acknowledged Wood's history of "lupus" and the county jail's summary of her specific prescriptions. *Id.* at 84-85, 89. However, Nurse Practitioner Pinkston only identified Wood's prescription for warfarin as ongoing.

[11] Four days later, Wood reported to Nurse Practitioner Pinkston that she "has [l]upus," which "has affected [her] kidneys," and that she "has been taking [hydroxychloroquine] 200 mg [twice daily]." *Id.* at 103. Nurse Practitioner Pinkston then restarted Wood's hydroxychloroquine prescription.

---

[4] There is no dispute that "[a] nurse practitioner is considered a provider, like a doctor. A nurse practitioner can prescribe medication, diagnose patients, order medical treatment, and develop a treatment plan for patients." Medical Appellees' App. Vol. IV at 78.

[12] On October 5, 2010, Dr. Raham met with Wood about her being "noncompliant" with her hydroxychloroquine prescription. *Id.* at 138. Dr. Raham would later testify that he allowed Wood's hydroxychloroquine prescription to "expire[]" in October of 2010 without "renewing" the prescription because Wood "had not taken her [hydroxychloroquine] for over a month and she had not had any lupus-related flare-ups or complications." Appellant's App. Vol. II at 174. According to Dr. Raham, although Wood had previously been permitted to keep her hydroxychloroquine on her person while at Rockville without any reports of improper use, "it was not medically sound to restart a medication that had known side effects if taken improperly." *Id.*

[13] Dr. Steven H. Neucks, a rheumatologist with the Rehabilitation Associates of Indiana, would later identify Dr. Raham's decision to discontinue the hydroxychloroquine as "a catastrophic error" that was "clearly . . . below the standard of care." Appellant's App. Vol. VI at 18, 24. At the time Dr. Raham discontinued Wood's hydroxychloroquine prescription, neither he nor Nurse Practitioner Pinkston counseled Wood about the importance of being compliant with that prescription even though lupus patients are often noncompliant with their medications due to the on-again, off-again nature of the disease. They also did not consult with a specialist or otherwise establish a long-term treatment plan for Wood's lupus. Conversely, when Wood had been noncompliant with her warfarin prescription, Dr. Raham counseled her on why that prescription was important, and Wood resumed her compliance.

[14]     Throughout her time at Rockville, Wood had numerous blood tests. Those blood tests frequently showed abnormal clotting results. *See Prothrombin time test*, Mayo Clinic (Feb. 17, 2020), mayoclinic.org/tests-procedures /prothrombin-time/about/pac-20384661/ [https://perma.cc/T3AS-ZG5G]. On multiple occasions, the blood tests showed "panic" level slow clotting. *E.g.*, Appellant's App. Vol. III at 143, 154, 167. However, the electronic medical records ("EMRs") created by Dr. Raham and Nurse Practitioner Pinkston just as frequently failed to show any consistent provider response to Wood's abnormal blood tests—often, a single EMR stated that Wood had been prescribed conflicting dosages of warfarin, one dosage that would have made sense only for quick-clotting blood and one dosage that would have made sense only for slow-clotting blood. *E.g.*, *id.* at 136. It is frequently not clear from the EMRs what dosages of warfarin, if any, Wood actually received at any given time.

*Madison Correctional Facility*

[15]     The DOC transferred Wood to the Madison Correctional Facility ("Madison") on December 29, 2010. Wood again reported to the Madison medical staff that she had lupus and blood clotting issues as "[c]hronic care conditions." *Id.* at 191. Corizon medical employees Dr. Hinchman and Nurse Practitioner Antle were responsible for Wood's medical care at Madison.

[16]     On January 14, 2011, Wood met with Dr. Hinchman and complained of lupus flare-ups. Following a blood test that showed increased inflammation, Dr.

Hinchman described Wood's lupus as "symptomatic." *Id.* at 207. He prescribed her a steroid but did not restart her hydroxychloroquine prescription, consult with a specialist, or establish a long-term plan of care for Wood's lupus. Although Wood's blood work over the next several months continued to show inflammation and Dr. Hinchman continued to recognize that her lupus was symptomatic, Wood's medical records do not demonstrate that Dr. Hinchman or Nurse Practitioner Antle ordered any further treatment for Wood.

[17] On May 22, Wood wrote a note to Corizon medical staff at Madison that stated she had "a butterfly rash" on her face from her lupus, and she had "been using hydrocortisone cream and it has not helped." *Id.* at 228. Dr. Hinchman again only prescribed a steroid.

[18] On June 4, Wood wrote another letter to Corizon medical staff at Madison complaining about the lupus-related butterfly rash on her face. Wood met with Nurse Practitioner Antle, who originally directed Wood to receive ibuprofen. However, that direction was "contraindicated with [the warfarin] therapy." *Id.* at 241. Nurse Practitioner Antle then directed Wood to apply hydrocortisone to her rash.

[19] Throughout her time at Madison, just as at Rockville, Wood had numerous blood tests. Those blood tests frequently showed abnormal clotting results. On multiple occasions, the blood tests showed "critical[ly]" slow clotting. *E.g.*, *id.* at 220; Appellant's App. Vol. IV at 128, 161. However, the EMRs created by Dr. Hinchman and Nurse Practitioner Antle just as frequently failed to show

any consistent provider response to Wood's abnormal blood tests. Often, a single EMR stated that Wood had been prescribed conflicting dosages of warfarin, and it was frequently not clear what dosage of warfarin Wood actually should have been taking at any given time. *E.g.*, Appellant's App. Vol. III at 220. On multiple occasions, the EMRs indicated that, in response to Wood's blood clotting more slowly than desired, Dr. Hinchman and Nurse Practitioner Antle either did nothing or erroneously identified Wood's blood-clotting history as demonstrating "therapeutic" results. *E.g.*, Appellant's App. Vol. IV at 66.

[20] In the fall of 2011, Wood's health began to demonstrate a "constellation of symptoms very strongly suggestive of lupus activity." Appellant's App. Vol. VI at 25. Stasha Merchant,[5] Wood's fellow inmate and "very close friend" at Madison, observed Wood "become really sick" shortly before Thanksgiving. *Id.* at 44. Wood "stopped eating," "couldn't get out of bed," and "had bad headaches." *Id.* Wood "was starting to lose some weight" and "was always tired." *Id.* She "also broke out in a rash" and started "to get sores on her legs from where the rashes were and they would bleed. She also had nose bleeds

---

[5] Corizon and the Corizon medical employees assert on appeal that the Estate "inappropriately use[s] portions of Affidavits" from Wood's fellow inmates "that were stricken" by the trial court during the summary judgment proceedings. Medical Appellees' Br. at 48 (bold removed). Corizon and the Corizon medical employees are simply wrong in their assessment; the Estate's brief accurately tracks only those portions of the relevant affidavits that the trial court deemed admissible, as do we.

sometimes." *Id.* Around the turn of the month, Wood's "gums were bleeding." *Id.* at 45.

[21] Over the next few months, Wood "was very weak." *Id.* She could not get her own food; Merchant and other inmates would have to hold Wood up and walk her. She could not go to the bathroom by herself; again, her fellow inmates "would help her," and "her urine smelled like death." *Id.* Wood could not write her own requests for medical assistance; Merchant and other inmates "would write [the] requests for her and have her sign them" until "[i]t got to the point where she didn't have enough strength to even sign her own name." *Id.* Wood "couldn't walk[,] feed herself, bathe herself, take her medication, or do her laundry; she could only lay in bed. Her deterioration was obvious . . . ." *Id.* Merchant took Wood "to medical" and recalled other prison officials observing Wood in this condition as well. *Id.* at 46.

[22] Sasheena Bonner, another inmate at Madison and one of Wood's "best friends" there, also observed Wood's deterioration during that same timeframe. *Id.* at 34. In December of 2011, Bonner observed that Wood "was very sick." *Id.* Wood's "skin color was yellowish and she was catching fevers" and "never got better." *Id.* By February of 2012, Wood could not "move, get out of bed, drink, [or] eat," and "blood [wa]s coming out of [her] ears." *Id.* at 35. Wood "would have blood in her underwear" that was not "from her menstrual cycle." *Id.*

Bonner "tried to get [Wood] help" but "no one wanted to listen." *Id.* Wood's "skin had these rashes" that Bonner could not "even describe. They were red and purple[] and covered three-fourths of her back and sides." *Id.* But the Corizon medical employees at Madison only gave Wood "Claritin or Ibuprofen," which Bonner then administered to Wood. *Id.* at 36. Bonner later recalled:

> They let her lay in bed incredibly sick for a month before they transferred her [to the Indiana Women's Prison]. She couldn't move, it hurt her to walk, she couldn't eat, and she was bleeding from her mouth and ears.
>
> . . . [Wood] was bleeding from her mouth and ears while at Madison for over a month.
>
> . . . She could barely talk, she couldn't lift her head, she could barely move, and [she] had a huge rash covering three-fourths of her back and sides.

*Id.*

Near the end of Wood's time at Madison, Nicole Marie Paul, another inmate and another of Wood's "best friends" at Madison, observed the following in February and March of 2012:

> [Wood's] health started to deteriorate rapidly in 2012. In February 2012, I remember [Wood] would just get tired a lot and did not feel well. . . . I noticed the rash on [Wood's] body the first week of March in 2012, and I noticed the blood that started leaking from [Wood's] gums and ears during the second week of March 2012.

*Id.* at 39.

[25]  Like Merchant and Bonner, Paul would help Wood go to the cafeteria and, later, bring Wood food when Wood could no longer walk. Paul observed that Wood had "these blotches all over her arms, by her shoulders, and they were really bad. . . . [Wood] couldn't get out of bed . . . and she lost so much weight, around 20 pounds . . . around the end of February or beginning of March." *Id.* at 40-41. Paul observed prison staff seeing Wood in this condition and doing nothing. Paul observed Wood "constantly trying to contact the medical facility in the prison." *Id.* at 40. "The majority of people there did not respond to her. . . . A couple of times she'd be gone" to medical "for a while, but usually they would just see her and send her back." *Id.*

[26]  Around early March of 2012, Dr. Hinchman and Nurse Practitioner Antle sent Wood to The King's Daughters' Hospital ("KDH") in Madison with concerns about swelling on Wood's arm. After later reviewing Wood's medical records and the testimony of those involved, Dr. Neucks would describe that sequence of events as follows:

> [T]here is a very poor hand off both from the prison to the ER and from the ER back to the prison. It appears quite clearly that the prison staff and nurse practitioners were quite concerned about [Wood's] arm and that it was swollen and red suggesting a lupus flare . . . . However[,] the KDH [staff] deals only with an upper respiratory tract infection and sends her back. When this dichotomy was identified at the prison[,] there was no remediation taken. When [Wood] was returned . . . , Dr. Hinchman orders Tylenol, fluids, and vital signs, but does not see [Wood] . . . . There was no further investigation of the arm

swelling, no further request for consultation, no further input. The problem was just sort of dropped.

By this time, [Wood] had fever, lethargy, pleuritic chest pain, low albumin, elevated globulins, rash, dropping hemoglobin, and 2+ proteinuria. This constellation is very likely related to her lupus. Unfortunately, there is no attempt on the part of Dr. Hinchman to put these things together to suggest lupus. There is no request for further input from internal medicine, or rheumatology, or any other specialist to see whether these items might be related to lupus and thus require treatment. In fact, he says this did not constitute a lupus flare-up.

When she was seen and had a [blood] sedimentation rate of 53, [which is an abnormally high result indicative of inflammation in the blood from lupus,] there was no follow-up recommended. There was no mention of a long-term plan. Dr. Hinchman and others . . . maintain the EMR document itself is a standing long-term care plan; however[,] there was no mention in the EMR of the long-term need to follow [Wood]. In fact[,] in spite of being on some brief [steroid] and having a sedimentation rate of 53 she was not seen again until routinely scheduled as required at three months.

At the next visit we find that her sedimentation rate was 126, this time again strongly suggesting a lupus flare. Her sedimentation rate has risen almost 100 points since she has been incarcerated and there is absolutely no interest on the part of the various physicians to modify or implement her treatment.

When she was eventually transferred to the Indiana Women's Prison . . . [, Dr. Hinchman] says that the reason was that her condition had worsened and that she now required 24-hour monitoring; however[,] it is clear from 03/01/201[2] to 03/19/201[2] when she was transferred that [Dr. Hinchman] did

not visit her for an office visit. It seems that if she
required . . . 24-hour care that visits more than every three weeks
would have been appropriate . . . making this analysis quite
suspect.

*Id.* at 16-17 (citations omitted).

[27] Dr. Neucks would add that Dr. Hinchman's treatment of Wood relied on "notoriously vague" standards; failed to account for "signal[s] of a more dangerous lupus complication"; and failed to account for the "two areas of system involvements that often lead to death in lupus" patients, renal system involvement and central nervous system involvement. *Id.* at 16. Dr. Neucks concluded that Dr. Hinchman's treatment of Wood was "clearly . . . below the standard of care" and "a link of failure in the chain that eventually caused" Wood's death. *Id.* at 18.

### *Indiana Women's Prison*

[28] On March 19, 2012, Dr. Raham, Dr. Hinchman, and Nurse Practitioner Antle decided that Wood's blood-clotting levels required "close monitoring." *Id.* at 51. Accordingly, the DOC transferred Wood to the Indiana Women's Prison in Indianapolis because "there is an infirmary" there." *Id.* Wood had to be transported in a wheelchair. Corizon medical employee Dr. Rains was

responsible for Wood's medical care at the Indiana Women's Prison. Corizon medical employees Grimes and Icenogle, registered nurses, assisted Dr. Rains.[6]

[29]     Wood spent four days at the Indiana Women's Prison before being transported by ambulance to Terre Haute Regional Hospital due to hypoxia. After later reviewing Wood's medical records and the testimony of those involved, Dr. Neucks would describe Dr. Rains' treatment of Wood at the Indiana Women's Prison as follows:

> Dr. Rains['] evaluation [of Wood] is equally problematic [to Dr. Hinchman's;] although she was only [at the Indiana Women's Prison] briefly[,] there is documentation of the seriousness of her status. The nurses' notes clearly state [Wood] is having marked difficulty walking. The nurses' notes suggest that she was a max assist of two. [Dr. Rains] dismisses this as needing a little help to the bathroom; however[,] I believe max assist of two strongly suggest[s] [Wood] was unable to ambulate on her own. [Dr. Rains] never attempted to examine [Wood's] ability to walk. This would have been a key to transferring her [to a hospital] sooner or initiating more aggressive therapy.
>
> Due to her low oxygen, a chest x-ray was ordered [the day after she arrived at the Indiana Women's Prison], but [it was] never accomplished. There is no note in the chart as to why it was not

---

[6] There is no dispute that, unlike a medical doctor or a nurse practitioner, a registered nurse is "unable to diagnose medical conditions, order medical treatment, prescribe medications, or make a treatment plan for a patient." Medical Appellees' App. Vol. IV at 126. Rather, registered nurses "triage patients and communicate their medical needs to the provider, i.e., the nurse practitioner or doctor, and then follow the provider's orders." *Id.* Further, a registered nurse is "able to provide first aid or life-saving medical care as needed, draw blood, administer medications, take vital signs, and other such nursing measures." *Id.*

done or any further attempt to get it done during her brief stay at that time.

*Id.* at 17 (citations omitted). Dr. Neucks continued:

It is clear from [Dr. Rains'] records that [Wood's] lupus flare had begun prior to her transfer [to the Indiana Women's Prison]. This is documented in several comments that he makes. At the time of her transfer which was "due to an elevated [test measuring her blood clotting]" he also noted the following[:] that she "had bleeding lips and gums"[;] that she also had "weakness and pain in her legs for a month"[;] and that she was "ill appearing[."] . . . He treated this constellation of symptoms with Tylenol. . . . [H]e notes that "she reported that she had felt bad for a month or so with fevers and myalgias[."] Additionally[,] he describes that she went to [KDH] for a rash and he himself documents a malar rash. . . . [H]e describes her as "in moderate distress and she was chronically ill appearing"[;] "[s]he had lost 20 pounds over the last month[."] Her records clearly document a steady[,] slow[,] downhill course presumably caused by her lupus which is apparent from the clinical record and well documented eventually by her autopsy. This suggests her downhill course or lupus flare began as far back as four to six weeks prior to [her transfer to the Indiana Women's Prison]. . . . [E]ven a cursory phone consult with [a] rheumatologist during this interval might have strongly and beneficially affected the course of [Wood's] illness.

. . . [T]he issue of [hydroxychloroquine] comes up on multiple occasions. Perhaps had she been treated with adequate steroid when she began to decline, and had the [hydroxychloroquine] been reinitiated as might have been standard of care for any rheumatology consult, this entire cascade of events might have been prevented. . . .

*Id.* at 22-23.

[30]     Regarding Wood's transfer to Terre Haute Regional Hospital, Dr. Neucks stated as follows:

> Finally, . . . Dr. Rains discusses [Wood's] transfer to Terre Haute Regional Hospital [on March 23]. He describes [Wood as having] a sedimentation rate of 136, arthralgias, myalgias, severe anemia, proteinuria, inability to walk, unexplained pains in her legs, hypoxia, and that she was not responding to steroids. However, he did not feel that this was a sufficient reason for her to be transferred as emergent. . . .
>
> [Wood] came to the [DOC] two years ago with the diagnosis of lupus. It seems quit[e] surprising to me this diagnosis yet eluded the Prison Medical System. . . . Additionally[,] there is some urgency in her transfer. When [Dr. Rains] arrived that morning [of March 23] he sees her quite early in the morning and notices that she is hypoxic. It is difficult to improve . . . hypoxia without high-levels of oxygen. This is certainly a dramatic change in her status. In addition to all of the symptoms listed this documents the severity of her illness. . . .

*Id.* at 23. Dr. Neucks further stated:

> [Wood] was then transferred to Terre Haute Regional Hospital. . . . [T]here is quite a bit of consternation amongst the various [hospital] physicians and hospital records as to why she was transferred so far away. Dr. Raham in his deposition notes that there were contracts between the prison system and the various "regional" hospitals such that this case was deemed to be transferred to Terre Haute Regional Hospital. However[,] Dr. Raham also says in his deposition . . . [that] if there was a rule that a patient who was sick or emergent could be transferred to the most appropriate hospital . . . he says unequivocally yes this

is true. Since Methodist Hospital was literally up [the] street from [the Indiana Women's Prison], it seems highly illogical that in an emergency situation [Wood] would be transported 70 miles to a regional hospital. . . . [W]hen she was admitted to Terre Haute Regional Hospital[,] she was transferred immediately to the intensive care unit and placed on a ventilator. This alone would strongly suggest[] that [Wood's] clinical status was indeed emergent and strongly suggests that her transfer to [a r]egional [h]ospital 70 miles away was inappropriate.

[Wood] was sent by ambulance to Terre Haute. Again[,] this appears to be somewhat of an oxymoron. If indeed it was necessary[,] which it obviously was, then transfer to a closer institution would have been appropriate. Additionally, [Dr. Rains] saw [Wood] at 08:26 in the morning, the ambulance was ordered at 10:20 in the morning, but she[] did not actually leave the [Indiana Women's Prison] until 11:30. This suggests either a severe or callous disregard for the patient's clinical status and that the infirmary setting itself was completely and totally inadequate for [Wood's] care. She was catastrophically sick. She was transferred to a remote institution somewhat casually. These findings alone suggest that the care under Dr. Rains at the [Indiana Women's Prison] was below the standard of care.

*Id.* at 17 (citations omitted). As he said with respect to Dr. Raham and Dr. Hinchman, Dr. Neucks stated that Dr. Rains' "care clearly f[ell] below the standard of care" and was "a link of failure in the chain that eventually caused the death of Rachel Wood." *Id.* at 18.

[31] After about three weeks at Terre Haute Regional Hospital, on April 13, 2012, Wood was discharged from the hospital and transported back "to prison" by "ambulance." Appellant's App. Vol. V at 9. However, at some point Corizon

directed the ambulance instead to transfer Wood to the Kindred long-term acute care hospital in Indianapolis. En route back to Indianapolis, Wood suffered from "gross hemoptysis"—"coughing up blood"—and died. *Id.* at 17; *Coughing up blood*, Mayo Clinic (Feb. 17, 2020), mayoclinic.org/symptoms/coughing-up-blood/basics/definition/sym-20050934/ [https://perma.cc/6AAC-MT78].

[32]    According to Dr. Neucks:

> [I]n review of the autopsy . . . from the Marion County Coroner's office[,] it suggests that her cause of death [was] "medical complications of pneumosepsis and coagulopathy. Contributory: Lupus erythematosus[."] . . . The medical complications of pneumosepsis reported by the Marion County Coroner include "A" history of lupus with antiphospholipid antibody syndrome[,] "B" status post splenectomy due to idiopathic thrombocytopenic purpura, and "C" admitted to the hospital on 03/23/12 for acute respiratory failure, pneumonia, sepsis, renal failure, and hypoxemia. This documents the role of lupus in her pneumosepsis and clearly the role of lupus and coagulopathy, both of which contributed to her death. The bleeding which did occur [in the final ambulance ride] was a subsidiary or a downstream event from those processes and not the primary cause. . . .

Appellant's App. Vol. VI at 25. Dr. Neucks further discussed Corizon's decision to transport Wood by ambulance from Terre Haute to Kindred as follows:

> Corizon made arrangements for Kindred long-term care facility to evaluate Ms. Wood . . . . This obviously . . . was a most disastrous suggestion. Once again[,] the long ride from Terre

Haute to Kindred undoubtedly strongly contributed to her acute
demise. . . . [T]he autopsy makes entirely clear that the
underlying cause of her death was from the lupus including its
involvement due to her immunosuppression and her splenectomy
all due to the lupus contributing pneumosepsis. As well
the . . . antiphospholipid antibody causing her clotting, [h]er
death may have been accelerated from the tracheal ulcerations
with blood casts that partially coated the trachea and airways. . . .

In reviewing the prior medical records we hear this unbelievable
story of [Wood] being shackled to her ambulance bed [en route
to Kindred] and coughing up blood. She would signal to the
nursing staff and prison staff her difficulty breathing. They
would unshackle her long enough to cough up blood and then
reshackle her. The absurdity of this is further compounded by
the fact that following the ambulance was a car full of guards.
Remind yourself at this time that [Wood] could not walk.
Perhaps if more effort had been expended to her medical
attention or that she had been transferred to a care facility closer
than the 70 miles [sic]. Finally, . . . we again see . . . [Corizon
medical staff] suggest that the [EMRs are] in fact the long[-]term
treatment plan . . . . I will point out that Dr. Rain[s], when he
was seeing [Wood] for the few days she was in the [Indiana
Women's Prison,] analyzed her status as being moderately ill,
febrile, short of breath, basically unable to walk (max assist of
two), severe anemia, [and having a] high sedimentation rate, and
his treatment plan was Tylenol. How this could pass for a long[-
]term treatment plan for a seriously ill lupus patient baffles me.

*Id.* at 20-21.

*Procedural History*

[33]     The Estate filed its first amended complaint against the DOC, Corizon, and the

Corizon medical employees in April of 2014. Thereafter, the DOC, Corizon,

and the Corizon medical employees separately moved for summary judgment. After some technical and user-error issues with electronic filing, in March of 2018 the trial court accepted as timely submitted the Estate's responses to the DOC and the Corizon medical employees as well as portions of the Estate's designated evidence. However, the trial court refused to accept the Estate's response to Corizon on Corizon's independent motion for summary judgment. Thereafter, the court entered summary judgment for the DOC, Corizon, and the Corizon medical employees. This appeal ensued.

# Discussion and Decision

### *1. Indiana's Summary Judgment Standards*

Summary judgment in Indiana is a "high bar" for a moving party to clear. *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014). As the Indiana Supreme Court has emphasized:

> Summary judgment is a desirable tool to allow the trial court to dispose of cases where only legal issues exist. But it is also a blunt instrument by which the non-prevailing party is prevented from having his day in court. We have therefore cautioned that summary judgment is not a summary trial, and the Court of Appeals has often rightly observed that it is not appropriate merely because the non-movant appears unlikely to prevail at trial. In essence, Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims.

*Id.* at 1003-04 (cleaned up).

[35] We review the trial court's decision on summary judgment *de novo*. *Id.* at 1003. Although the nonmoving party "has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court." *Id.* (quotation marks omitted). In our review, we apply the same standard that the trial court should have applied: we look only to the designated evidence and the reasonable inferences therefrom that are most favorable to the nonmoving party. *Id.* We first consider whether the moving party "affirmatively negate[d] an opponent's claim." *Id.* (quotation marks omitted). If so, we then consider whether the nonmoving party has demonstrated that the designated evidence shows a genuine issue of material fact. *Id.* "A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth . . . ." *Id.* (quotation marks omitted). Although the trial court here entered findings and conclusions in its summary judgment orders, such findings and conclusions are neither required under Indiana Trial Rule 56(C) nor binding on this Court in our review. *E.g.*, *Knighten v. E. Chicago Hous. Auth.*, 45 N.E.3d 788, 791 (Ind. 2015).

## 2. The Estate's Claims

[36] The Estate's claims against the Corizon medical employees are premised on 42 U.S.C. § 1983. That statute "provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983). "Anyone

whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." *Id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Corizon and the Corizon medical employees do not dispute that they were state actors for purposes of the Estate's § 1983 claims.

[37] According to the Estate, each of the Corizon medical employees was "deliberately indifferent" to Wood's "serious medical needs, which constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution."[7] Appellant's App. Vol. II at 167. The Estate then alleged that Corizon itself was liable "for the torts committed by [its] agents in the course of their employment under the doctrine of *respondeat superior*." *Id.* at 166.

[38] The Estate also sued the DOC. According to the complaint, the DOC had "a duty under Indiana law to take reasonable steps to provide for the health and safety of inmates in its custody," which steps the DOC "failed to take" on behalf of Wood. *Id.* In particular, the Estate alleged that the DOC failed "to ensure that . . . Corizon carried out its contractual duty to provide reasonable medical care" to Wood. *Id.* at 167.

### 3.  The Corizon Medical Employees

#### 3.1.  The Deliberate Indifference Standard

---

[7] There is no dispute that the Eighth Amendment's prohibition against cruel and unusual punishment is applicable against the DOC, Corizon, and the Corizon medical employees.

The Estate asserts that the Corizon medical employees were each deliberately indifferent to Wood's serious medical needs. "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation and quotation marks omitted). As the Supreme Court of the United States has explained:

> [The Eighth] Amendment proscribes more than physically barbarous punishments. The Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency, against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society.
>
> These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency . . . .

*Id.* at 102-03 (cleaned up). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations and quotation marks omitted).

[40] Deliberate indifference does not require a showing that the prison officials acted "maliciously and sadistically for the very purpose of causing harm." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991) (quotation marks omitted). But, while deliberate indifference requires showing more than "mere negligence, " *id.*, and "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle*, 429 U.S. at 106, it also does not require a plaintiff to show that he was "literally ignored" by prison medical staff. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quotation marks omitted).

[41] Instead, the Supreme Court of the United States has held that "acting . . . with deliberate indifference . . . is the equivalent of recklessly disregarding" a "substantial risk of serious harm to a prisoner." *Farmer*, 511 U.S. at 836. Thus, for a prison medical official to be liable for the denial of adequate medical care, the prisoner must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837.

[42] In other words, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually would* befall an inmate; it is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of serious harm." *Id.* at 842 (emphases added). As the United States Court of Appeals for the Seventh Circuit has put it, the prisoner "must show only that the defendants' responses to [his serious medical conditions]

were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524. Conversely, a prison official may avoid liability under the deliberate-indifference standard if he can show that he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

[43] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ." *Id.* at 842. Evidence of repeated examples of medical mistreatment or systemic deficiencies in medical treatment have been held to demonstrate deliberate indifference. As the United States Court of Appeals for the Second Circuit has said, "while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities . . . ." *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977). And the Seventh Circuit has held that juries may conclude that a prisoner has been "effectively denied access to adequate medical care" from evidence of "systemic and gross deficiencies in staffing, the quality of personnel, and sick call procedures." *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1186 (7th Cir. 1985) (quotation marks omitted).

[44] With those principles in mind, we turn to the Estate's claims against the Corizon medical employees. We initially note, however, that there is no dispute that Wood suffered from serious medical conditions during her time in the DOC facilities. There is also no dispute that each of the Corizon medical

employees was actually aware of her serious medical conditions. Thus, the dispute here turns on whether the designated evidence supports at least an inference that the Corizon medical employees "disregard[ed] an excessive risk to [Wood's] health or safety." *See Farmer*, 511 U.S. at 837. We divide our analysis of that question between the actual providers of Wood's medical care and the registered nurses.

### 3.2. Wood's Medical Providers

[45] Genuine issues of material fact preclude the entry of summary judgment for Wood's medical providers—Corizon medical employees Dr. Raham, Dr. Hinchman, Dr. Rains, Nurse Practitioner Pinkston, and Nurse Practitioner Antle. A reasonable finder of fact could readily conclude from the designated evidence that Wood's medical providers, individually or collectively, acted or failed to act despite their knowledge of a substantial risk of serious harm to Wood or otherwise were plainly inappropriate in their treatment of Wood's serious medical conditions so as to permit the inference that those providers intentionally or recklessly disregarded her needs.

[46] Dr. Neucks' designated sworn statements include the following assessments of Dr. Raham's treatment of Wood at Rockville:

> In [Dr. Raham's deposition] he lists several organ systems that can be involved with lupus. He seems to be knowledgeable about lupus being a multiorgan system disease[;] however, when [Wood] had rashes, joint pain, kidney disease, and weakness he did not seem to think that any of these were related to her lupus, which they obviously were.

* * *

[Lupus] is a disease . . . that can be dormant and then subject to flare up. Thus[,] often patients with lupus have a higher level of non[-]compliance [with their medications] because patients tend to get complacent when they are not having a flare up and stop taking their medication[s] . . . . Wood stopped taking her [hydroxychloroquine]. When she noted to [Dr. Raham] that she had stopped taking it, [he] discontinued the medication.

I believe *this was a catastrophic error* . . . .

Appellant's App. Vol. VI at 17, 24 (emphasis added). Dr. Neucks added:

[Dr. Raham] does discuss that non[-]compliance with medications occasionally occurs both in the prison medicine and in standard medical practices. He notes that [Wood] was non[-]compliant with her [hydroxychloroquine] and the medicine was eventually discontinued. He says that the discontinuation of [hydroxychloroquine] could have been part of the problem that she got so sick.

I then beg to question as to why no one ever mentioned it in the chart, and it was never brought . . . up to the patient, and most certainly never restarted. I am quite confident that any consultation with rheumatology, *even a cursory phone consultation, would have strongly suggested the re-implementation of [hydroxychloroquine]*. [Wood] is originally non[-]compliant with her [warfarin], but after discussion with the physician becomes compliant . . . saying she did not realize it is important. This would suggest that the patient indeed would have been compliant with the [hydroxychloroquine] if it had been simply mentioned to her how important it was[,] especially as she became increasingly sick. This alone could have had a major beneficial impact.

*Id.* at 18 (emphasis added).

[47]    Dr. Dianne Sommers, another of the Estate's designated experts, also provided sworn statements and agreed with Dr. Neucks' assessment that Dr. Raham's discontinuation of Wood's hydroxychloroquine and failure to counsel Wood about that medication "shows a *basic lack of understanding* of [lupus] as a disease and how it is treated." *Id.* at 29 (emphasis added). Although those sworn statements are explicitly in reference to Dr. Raham, a reasonable fact-finder could conclude they are just as applicable to Nurse Practitioner Pinkston, who also actually treated Wood at Rockville and shared responsibility for providing Wood's medical care at that facility.

[48]    Regarding Dr. Hinchman's treatment of Wood at Madison, Dr. Neucks' designated sworn statements include the following:

> [Despite the purported basis for transferring Wood to KDH,] the KDH [staff] deals only with an upper respiratory tract infection and sends her back. *When this dichotomy was identified at the prison[,] there was no remediation taken. When [Wood] was returned . . . , Dr. Hinchman orders Tylenol, fluids, and vital signs, but does not see [Wood] . . . . There was no further investigation of the arm swelling, no further request for consultation, no further input. The problem was just sort of dropped.*
>
> By this time, [Wood] had fever, lethargy, pleuritic chest pain, low albumin, elevated globulins, rash, dropping hemoglobin, and 2+ proteinuria. This constellation is very likely related to her lupus. Unfortunately, *there is no attempt on the part of Dr. Hinchman to put these things together to suggest lupus. There is no request for further input from internal medicine, or rheumatology, or any other specialist to*

*see whether these items might be related to lupus and thus require treatment. In fact, he says this did not constitute a lupus flare-up.*

When she was seen and had a [blood] sedimentation rate of 53, [which is an abnormally high result indicative of inflammation in the blood from lupus,] *there was no follow-up recommended. . . .*

At the next visit we find that her sedimentation rate was 126, this time again strongly suggesting a lupus flare. *Her sedimentation rate has risen almost 100 points since she has been incarcerated and there is absolutely no interest on the part of the various physicians to modify or implement her treatment.*

When she was eventually transferred to the Indiana Women's Prison . . . [, Dr. Hinchman] says that the reason was that her condition had worsened and that she now required 24-hour monitoring; however[,] *it is clear from 03/01/201[2] to 03/19/201[2] when she was transferred that [Dr. Hinchman] did not visit her for an office visit. It seems that if she required . . . 24-hour care that visits more than every three weeks would have been appropriate . . . making this analysis quite suspect.*

*Id.* at 16-17 (emphases added; citations omitted). Although those statements are explicitly in reference to Dr. Hinchman, a reasonable fact-finder could conclude they are just as applicable to Nurse Practitioner Antle, who also actually treated Wood at Madison and shared responsibility for providing Wood's medical care there.

[49] Regarding Dr. Rains' treatment of Wood at the Indiana Women's Prison, Dr. Neucks' designated sworn statements include the following:

Dr. Rains['] evaluation [of Wood] is equally problematic [to Dr. Hinchman's;] although she was only [at the Indiana Women's Prison] briefly[,] there is documentation of the seriousness of her status. The nurses' notes clearly state [Wood] is having marked difficulty walking. The nurses' notes suggest that she was a max assist of two. *[Dr. Rains] dismisses this as needing a little help to the bathroom; however[,] I believe max assist of two strongly suggest[s] [Wood] was unable to ambulate on her own. [Dr. Rains] never attempted to examine [Wood's] ability to walk.* This would have been a key to transferring her [to a hospital] sooner or initiating more aggressive therapy.

Due to her low oxygen, *a chest x-ray was ordered [the day after she arrived at the Indiana Women's Prison], but [it was] never accomplished*. There is no note in the chart as to why it was not done or any further attempt to get it done during her brief stay at that time.

*Id.* at 17 (emphases added; citations omitted). Dr. Neucks continued:

It is clear from [Dr. Rains'] records that [Wood's] lupus flare had begun prior to her transfer [to the Indiana Women's Prison]. This is documented in several comments that he makes. . . *He treated this constellation of symptoms with Tylenol*. . . . Her records clearly document a steady[,] slow[,] downhill course presumably caused by her lupus which is apparent from the clinical record and well documented eventually by her autopsy. This suggests her downhill course or lupus flare began as far back as four to six weeks prior to [her transfer to the Indiana Women's Prison]. . . . *[E]ven a cursory phone consult with [a] rheumatologist during this interval might have strongly and beneficially affected the course of [Wood's] illness.*

. . . [T]he issue of [hydroxychloroquine] comes up on multiple occasions. Perhaps had she been treated with adequate steroid

when she began to decline, and *had the [hydroxychloroquine] been reinitiated as might have been standard of care for any rheumatology consult, this entire cascade of events might have been prevented.* . . .

*Id.* at 22-23 (emphases added).

Dr. Neucks added that Dr. Rains' decision to transport Wood seventy miles by ambulance when she was hypoxic, emergent, and "catastrophically sick" was "inappropriate," an "oxymoron," and represented "a severe or callous disregard for [Wood's] clinical status." *Id.* at 17. Dr. Neucks further added that the infirmary at the Indiana Women's Prison "itself was completely and totally inadequate for [Wood's] care." *Id.*

Dr. Neucks also lamented the failure of Wood's medical providers to establish a long-term treatment plan for her:

> There was no mention of a long-term plan. Dr. Hinchman and others . . . maintain the EMR document itself is a standing long-term care plan; however[,] there was no mention in the EMR of the long-term need to follow [Wood]. In fact[,] in spite of being on some brief [steroid] and having a sedimentation rate of 53 she was not seen again [by Dr. Hinchman] until routinely scheduled as required at three months.

> * * *

> In reference to her treatment plan . . . , [Dr. Raham] says that the [EMR] was her treatment plan. Again[,] there is just no documentation that this was used as an effective tool or to be in compliance with the prison system['s] mandate of a treatment plan for chronically ill patients. . . .

> The necessity of a long-term treatment plan for lupus is quite obvious as this disease waxes and wanes. Vigilance for these needs to be undertaken. The fact [Wood] steadily declines and eventually dies, all without a plan, supports the inadequacy of the EMR as a plan.
>
> There is nothing in her chart that suggests long-term care of any kind. . . .
>
> * * *
>
> It is clear that use of the [EMR] order system as a long[-]term treatment plan for a lupus patient was completely and totally inadequate and falls well below the standard of care for any physician under these circumstances.

*Id.* at 16, 18, 21.

[52] Dr. Neucks summarized his assessment of Wood's medical providers as follows: "all three physicians['] care clearly falls below the standard of care. Each a link of failure in the chain that eventually caused the death of Rachel Wood." *Id.* at 18. Again, while that statement was explicitly in reference to the three physicians, a reasonable fact-finder could conclude that it is equally applicable to the two nurse practitioners on this record.

[53] In sum, the designated evidence shows that Wood's medical providers rendered care that was described by other medical professionals as "callous," "a severe . . . disregard for [Wood's] clinical status," "inappropriate," "catastrophic," showing "absolutely no interest" in Wood's treatment, "quite suspect," "dismiss[ive]," and "clearly . . . below the standard of care." *Id.* at 16-

18, 24. The designated evidence shows that Wood's medical providers' treatment of Wood "discontinued" essential medication; showed a "basic lack of understanding" of Wood's lupus; repeatedly failed to make "even a cursory phone consultation" that "would have strongly suggested the re-implementation" of her lupus medication; took "no remediation" when learning of KDH's failure to address specific medical concerns and instead "just sort of dropped" those concerns; addressed the "constellation" of lupus symptoms "with Tylenol"; repeatedly failed to recommend or undergo basic follow-up appointments; showed "absolutely no interest" in "modify[ing] or implement[ing]" appropriate treatment plans; had no clear or effective long-term plan in place, despite the "necessity" of such a plan for Wood; implemented no "long-term care of any kind"; and failed to appropriately transport her in emergent circumstances. *Id.* at 16-18, 22-24, 29. The Estate's medical expert further explicitly testified that the failures of Wood's medical providers were "link[s] . . . in the chain" that resulted in her death. *Id.* at 18.

[54] A reasonable fact-finder could readily conclude from the designated evidence that the responses of Wood's medical providers to her serious medical conditions "were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded [Wood's] needs." *Hayes*, 546 F.3d at 524. The record does not suggest a single or isolated instance of medical mistreatment, nor does it suggest that Wood's medical providers reasonably responded to her needs but simply failed to avert harm. The record instead shows systemic and gross deficiencies in her medical care throughout

her incarceration, which deficiencies the Estate's expert directly connected to her cause of death. Genuine issues of material fact support at least an inference that the Wood's medical providers "disregard[ed] an excessive risk to [Wood's] health or safety." *Farmer*, 511 U.S. at 837. Accordingly, the trial court erred when it entered summary judgment for Dr. Hinchman, Dr. Raham, Dr. Rains, Nurse Practitioner Antle, and Nurse Practitioner Pinkston.

### 3.3. The Registered Nurses

Conversely, there is no evidence that the two registered nurses at the Indiana Women's Prison—Nurse Grimes and Nurse Icenogle—breached the standard of care relevant for registered nurses, let alone acted with deliberate indifference toward Wood's serious medical needs. To the contrary, the record is clear that at all relevant times Nurse Grimes and Nurse Icenogle were acting under the direction of Dr. Rains, and at all relevant times Dr. Rains, not Nurse Grimes or Nurse Icenogle, was responsible for Wood's treatment and care. Thus, Nurse Grimes and Nurse Icenogle affirmatively negated the Estate's showing that they acted in a plainly inappropriate manner, and they are entitled to judgment as a matter of law. We therefore affirm the trial court's entry of summary judgment for Nurse Grimes and Nurse Icenogle.

### 3.4. The Remaining Corizon Medical Employees' Other Arguments

We briefly address the remaining Corizon medical employees' other arguments on appeal. We initially note, however, that the substantial part of their argument on appeal takes one of two approaches: either the remaining Corizon

medical employees simply disregard the designated evidence that is most favorable to the Estate, or they assert that the Estate's expert testimony is insufficient as a matter of law. Regarding the first line of attack, we reject their attempt to disregard Indiana's summary judgment standards—as shown above, the designated evidence most favorable to the Estate readily shows genuine issues of material fact precluding the entry of judgment as a matter of law.

[57] As for the second line of attack, the remaining Corizon medical employees suggest that Dr. Neucks' sworn statements are not sufficient to avoid summary judgment because he did not explicitly use the legal term-of-art "deliberate indifference" in his sworn statements. But the remaining Corizon medical employees cite no Indiana authority that requires an expert to invoke a specific term to avoid summary judgment in causes such as this. We instead look to the clear import of the designated evidence as a whole, in the light most favorable to the summary judgment nonmovant, and determine whether a finder of fact can infer the legal standard of deliberate indifference from that evidence. Again, as demonstrated above, we hold that that test is readily satisfied. Further, insofar as the remaining Corizon medical employees assert that the designated evidence shows medical malpractice but not deliberate indifference, we conclude that, on this record, that degree of difference is for the finder of fact.

[58] The remaining Corizon medical employees also suggest that the trial court did not err in entering summary judgment because the Estate did a poor job citing the designated evidence in its brief to the trial court. Be that as it may, our

standard of review in this appeal is *de novo*, and the Estate's brief to our Court is more than adequate. We will not decide this appeal on those grounds.

### 4. Corizon

[59] We next address the trial court's entry of summary judgment for Corizon. As noted above, the Estate sued Corizon under the doctrine of *respondeat superior*— that is, on the theory that the corporate entity was responsible for the tortious acts of its employees when those acts occurred within the scope of their employment. *E.g.*, *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 460 (Ind. 2018). In the trial court, Corizon moved for summary judgment independently of the Corizon medical employees. For various procedural reasons, the trial court concluded that the Estate failed to respond to Corizon's motion for summary judgment and then entered summary judgment for Corizon. And, on appeal, the parties dispute whether the trial court erred when it refused to accept the Estate's response to Corizon's motion for summary judgment and treated Corizon's motion for summary judgment as if it were unopposed.

[60] But we need not decide those questions. Instead, we hold that the evidence designated by the parties with respect to the Estate's claims against the Corizon medical employees is relevant and available against Corizon under the doctrine of *respondeat superior*. Indeed, in its summary judgment motion to the trial court, Corizon conceded that it can be liable under the doctrine of *respondeat superior* on a claim of deliberate indifference if the designated evidence were to show "systemic and gross deficiencies" such that "the inmate population is effectively denied access to adequate medical care." Appellant's App. Vol. V at

160-61 (quotation marks omitted). As we have already held, the designated evidence that was properly before the trial court on the Estate's claims against the Corizon medical employees demonstrates that genuine issues of material fact exist as to whether such systemic and gross deficiencies existed here. Accordingly, the trial court erred when it entered summary judgment for Corizon.

### 5. *The DOC*

Finally, we address the trial court's entry of summary judgment for the DOC. The Estate sued the DOC on the ground that the DOC had, under Indiana law, negligently failed to supervise its contractor. Specifically, the Estate asserts that the DOC negligently failed to discover that Corizon had no treatment plan for Wood and that Corizon had not met Wood's medical needs.[8] As our Supreme Court has explained: "Prevailing on a negligence claim requires fulfillment of three elements: 1) duty owed to plaintiff by the defendant; 2) breach of duty by allowing conduct to fall below the applicable standard of care; and 3) compensable injury proximately caused by defendant's breach of duty." *Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*, 72 N.E.3d 908, 913 (Ind. 2017).

---

[8] We need not consider the Estate's additional argument that the DOC acted negligently when it placed Wood in shackles while she was being transported by ambulance on the date of her death.

[62] There is no dispute that the DOC owed Wood a duty to ensure that Corizon provided appropriate medical care for Wood. *See* Appellant's Br. at 59; Appellee Ind. Dep't of Corr.'s Br. at 18-23. As we have stated:

> public policy considerations require that the DOC not be made an absolute insurer of prisoners' safety. Although the DOC is not a guarantor, neither has it been relieved of all responsibility for safekeeping its charges. Rather, the DOC's responsibility takes the middle ground: it has the duty "to take reasonable precautions to preserve the life, health, and safety of prisoners."

*Cole v. Ind. Dep't of Corr.*, 616 N.E.2d 44, 45-46 (Ind. Ct. App. 1993) (quoting *Reed v. State*, 479 N.E.2d 1248, 1254 (Ind. 1985)), *trans. denied*. "Because of the DOC's unusual ability to control all aspects of its prisoners' lives, the DOC's duty to take reasonable precautions may include an obligation to control the conduct of third persons." *Id.* at 46. The DOC's contract with Corizon acknowledged that duty by requiring Corizon to maintain records "for contract monitoring" by the DOC and by requiring Corizon to comply with the DOC's written health care services directives. Appellant's App. Vol. V at 231.

[63] As the question of the DOC's duty to Wood is not an issue, we turn to the questions of breach and proximate causation. Unlike the existence of a duty, "[w]hether a party breached its duty is a factual question generally not appropriate for summary disposition." *Cole*, 616 N.E.2d at 46 (quotation marks omitted). Likewise, "determining proximate cause in negligence cases . . . is a particularly fact-sensitive issue." *Cox*, 107 N.E.3d at 464.

[64] Genuine issues of material fact preclude the entry of summary judgment for the DOC on the questions of breach and proximate causation. The designated evidence shows that the DOC required Corizon to establish and maintain treatment plans for inmates, which were to be "formal written plans that identify serious health conditions referenced from [a master] problem list, describe goals and outcomes, list the planned interventions, and describe which professional discipline is responsible for carrying them out." Appellant's App. Vol. VI at 129, 131. For "serious conditions" such as Wood's lupus, treatment was to be "in a consistent and continuing fashion" with "a structured process." *Id.* at 133.

[65] As explained by Dr. Neucks, those requirements were simply never implemented for Wood, a multi-year inmate who suffered from serious medical conditions upon first arriving in the DOC's care. Moreover, many of Wood's EMRs are facially inconsistent, such as with her warfarin dosages. And Dr. Neucks' sworn statements include his assessment that the infirmary at the Indiana Women's Prison, where Wood was seen by Dr. Rains immediately prior to her transfer to Terre Haute Regional Hospital, was "completely and totally inadequate for . . . patient care." *Id.* at 17. Further, regarding causation, Dr. Neucks stated that the lack of an appropriate treatment plan contributed to Wood's death.

[66] Accordingly, whether the DOC breached its duty to Wood by not sufficiently monitoring Corizon such that it might have discovered those failures is a question for the finder of fact. Likewise, whether the DOC could have avoided

or mitigated harm to Wood with more effective monitoring of Corizon is an open question of material fact. Thus, the trial court erred when it entered summary judgment for the DOC.[9]

## Conclusion

[67] In sum, while we affirm the trial court's entry of summary judgment for Nurse Grimes and Nurse Icenogle, the record includes abundant designated evidence that should be considered by a trier of fact and therefore precludes summary judgment for Dr. Hinchman, Dr. Raham, Dr. Rains, Nurse Practitioner Antle, Nurse Practitioner Pinkston, Corizon, and the DOC. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

[68] Affirmed in part, reversed in part, and remanded for further proceedings.

Vaidik, J., and Tavitas, J., concur.

---

[9] On appeal, the DOC asserts that it met its *contractual* duty to monitor Corizon and that, had the DOC discovered Corizon's failures, the DOC's only *contractual* remedy would have been to impose a financial penalty on Corizon. But those assertions are not dispositive on the Estate's claim that the DOC *negligently* failed to discover Corizon's failures, which breach of its duty to Wood proximately caused Wood's death.